UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------- X

ANTHONY BELLERE, ARTHUR BROWN, ADONES BETANCES, STEVEN CHIRSE, RICARDO CISNEROS, LATIK EDWARDS, FLOYD HARDEN, WAGNER MONTERO, EMILIANO RODRIGUEZ, KABARY SALEM, CHRISTOPHER SANDERS, ALEXE ST. FLEUR, DARRYL WILLIAMS, MICHAEL HARRIS, and DAVID MCCALL, individually, and on behalf of similarly situated individuals,

Plaintiffs,

-against-

THE CITY OF NEW YORK, LOUIS A. MOLINA, LYNELLE MAGINLEY-LIDDIE, RONALD BRERETON, CHARLTON LEMON, CHRISTOPHER CURRENTI, RONALD MILLER, STEVEN RAMKISSOON, NATALIE TAWIAH, TERESA MACK, TEHISA SKINNER, KRYSTAL FORDE, NIKEMA HARRELL, JERMAIN PHILLIPS, DAIN DEALLIE, SHANEL WHITFIELD, TANOYA COPELAND, NATIAH MAYO, THE NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, MITCHELL KATZ, M.D., ERIC WEI, M.D., PATRICIA YANG, BIPIN SUBEDI, M.D., NANCY ARIAS, R.N., CARLOS CASTELLANOS, ZACHARY ROSNER, M.D., PHYSICIAN AFFILIATE GROUP OF NEW YORK, P.C., EDWARD CHEW, M.D., RICHARD BECKER, M.D., LISA CHOLEFF, M.D., JAYANTA RAY, M.D., JAMES PATRICK, P.A., GUY KELLY, P.A., PARVIZ RAFAELMEHR, M.D., THOMAS SCHWANER, P.A, TAHMINA SIKDER, M.D., ESPERANCE NDAYISHIMIYE, P.A., IOSIF SHPITS, M.D., BERNARD CHUKWUNEKE, M.D., FRANKLIN DE JESUS MEJIA, M.D., URGICARE MEDICAL ASSOCIATES, P.C., FRANK FLORES, D.O., PETER WACHTEL, D.O., ADAM LITROFF, D.O., and JOHN OR JANE DOES 1-40,

Defendants.

------------------------------------------------------------------------- X

**CLASS COMPLAINT**

Docket No.: 24 CV 5131

**JURY TRIAL DEMANDED**

     1.    Plaintiffs Anthony Bellere, Arthur Brown, Adones Betances, Steven Chirse, Ricardo Cisneros, Latik Edwards, Floyd Harden, Wagner Montero, Emiliano Rodriguez, Kabary Salem, Christopher Sanders, Alexe St. Fleur, Darryl Williams, Michael Harris, and David McCall,

individually, and individually, and on behalf of similarly situated individuals, by their attorneys, LIAKAS LAW, P.C., for their Complaint against Defendants The City of New York, Louis A. Molina, Lynelle Maginley-Liddie, Ronald Brereton, Charlton Lemon, Christopher Currenti, Ronald Miller, Steven Ramkissoon, Natalie Tawiah, Teresa Mack, Tehisa Skinner, Krystal Forde, Nikema Harrell, Jermain Phillips, Dain Deallie, Shanel Whitfield, Tanoya Copeland, Natiah Mayo, The New York City Health and Hospitals Corporation, Mitchell Katz, M.D., Eric Wei, M.D., Patricia Yang, Bipin Subedi, M.D., Nancy Arias, R.N., Carlos Castellanos, Zachary Rosner, M.D., Physician Affiliate Group of New York, P.C., Edward Chew, M.D., Richard Becker, M.D., Lisa Choleff, M.D., Jayanta Ray, M.D., James Patrick, P.A., Guy Kelly, P.A., Parviz Rafaelmehr, M.D., Thomas Schwaner, P.A, Tahmina Sikder, M.D., Esperance Ndayishimiye, P.A., Iosif Shpits, M.D., Bernard Chukwuneke, M.D., Franklin De Jesus Mejia, M.D., Urgicare Medical Associates, P.C., Frank Flores, D.O., Peter Wachtel, D.O., Adam Litroff, D.O., and John or Jane Does 1-40, respectfully allege as follows:

## PRELIMINARY STATEMENT

2.      Plaintiffs bring this putative class action for a host of violations of their rights, privileges, and immunities, secured by the United States Constitution, including the Fourth, Eighth, and Fourteenth Amendments pursuant to 42 U.S.C. §§ 1983 and 1988, and related laws of the State and City of New York arising from a fire at the North Infirmary Command on April 6, 2023.

3.      In the summer of 2023, New Yorkers became acquainted with the dangers of smoke exposure as the air around the Northeastern United States filled with smoke from wildfires from Canada and were encouraged to take shelter from the smoke lest they inhale toxins and particulates that could cause near and long-term health problems.

4.      For inmates in the custody of the New York City Department of Correction ("DOC"), however, exposure to smoke from fires is a regular occurrence because of the malfeasance, deliberate indifference, and reckless disregard of human life that is the reality of the DOC.

5.      The idea that detainees who have not been convicted of any crime - can be locked inside of a burning building and left to suffer and die is to most Americans, a barbaric notion reserved for movies and television shows depicting the cruelties and brutality of the past.

6.      Yet on April 6, 2023, a fire in the North Infirmary Command burned out of control and filled the building with thick black smoke.

7.      The incarcerated individuals housed in the North Infirmary Command were locked in their cells and dormitories where they choked on toxic black smoke, some vomiting, some losing consciousness, all gasping for air, because the City had trapped them in the facility while its own employees escaped to safety.

8.      The Constitution requires the City to take steps before, during, and after a fire to prevent both the fires themselves and the harm they create. As described herein, the City has failed at every stage.

9.      The City of New York, acting through its various organs such as DOC, the New York City Health and Hospitals Corporation ("HHC"), the Department of Health and Mental Hygiene ("DOHMH"), the New York City Fire Department ("FDNY"), the Board of Correction ("BOC"), the various District Attorneys and law departments of the City, and the Department of Citywide Administration ("DCAS"), amongst others, play roles in allowing the cruelty by fire to continue.

10.     Similarly, the City has failed to develop policies, practices, and procedures, resulting in numerous constitutional, statutory, and common law violations to Plaintiffs and the classes they seek to represent.

11.     Specifically, the City of New York has failed to develop provide adequate fire suppression systems, has failed to operate, repair, and maintain its jails consistent with the minimum standards for fire safety, has failed to develop fire evacuation protocols, has failed to provide adequate emergency and follow-up medical services, has failed to adequately train, supervise and discipline regarding fire safety and care, and has failed to provide adequate remediation for jails where fires have occurred.

12.     Moreover, the City has been on notice for decades that it subjects inmates to the most deplorable and unsafe conditions and that its staff will almost always make the wrong choice when it comes to inmate safety.

13.     Indeed, in 1998, the Honorable Harold Baer, a District Judge in this Court, found that conditions at some of the City's jails "pose an unreasonable risk of serious damage to the future health of pretrial detainees through fire" and ordered improvements ongoing improvements. *Benajmin v. Kerik*, No. 75 CIV. 3073(HB), 1998 WL 799161, at *5 (S.D.N.Y. November 13, 1998).

14.     Even worse, since the 1970s, the City has sought to hide behind the same tired excuse that it trots out every time its inexcusable failures are discovered - that it lacks resources both in terms of funding and personnel – it does not.

15.     What the City lacks is a basic respect for the lives of those it has sworn a duty to protect and for the Constitution which it must uphold.

16.     If there is any doubt as to the extraordinary danger that these acts and omissions pose to human life, one need only look to the June 26, 1977, Maury County Jail fire in Maury County, Tennessee, which is often used as a case study, including by the U.S. Department of Justice, National Institute of Corrections, to warn of the dangers of smoke inhalation and the importance of quickly evacuating inmates during all fires.

17.     The Maury County Jail fire killed 33 inmates and 9 visitors, none of whom were burned.  All 42 deaths were caused in minutes by the inhalation of smoke created by a fire started by an inmate.  The wood, fire retardant fabrics, and other toxic materials were burned and transmitted through the ventilation system throughout the jail.

18.     When the inmates' bodies were found, they were piled in the showers, their faces wrapped with towels, covered in black, oily, residue from the smoke.  The smoke they had inhaled contained strands of carbon and other thick particulate matter as well as cyanide, a deadly toin which in its gaseous form is a common byproduct of structure fires.

19.     The inmates in the Maury County fire could not be evacuated because the corrections staff could not quickly locate the keys necessary to open the doors.  Here, nearly fifty years later, the officers and supervisors involved in the April 6, 2023, fire and those fires occurring thereafter, did not even attempt to evacuate the Plaintiffs.

20.     Plaintiffs bring this lawsuit not only to address the lasting injuries they have suffered and will suffer, but because they know that it is only a matter of time before DOC's flagrant disregard for the law, and the rights of those in its custody results in a mass casualty event.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2) because at least one defendant resides in this judicial district and a substantial part of the events giving rise to this claim occurred in this judicial district.

22.    This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under laws of the United States.

23.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, because any claims brought under New York State or City of New York law are so related to the claims for which this Court has original jurisdiction that they form the same case or controversy.

24.    Plaintiffs Anthony Bellere, Adones Betances, Arthur Brown, Steven Chirse, Ricardo Cisneros, Latik Edwards, Floyd Harden, Wagner Montero, Emiliano Rodriguez, Kabary Salem, Christopher Sanders, Alexe St. Fleur, and Darryl Williams served Notices of Claim on the City of New York and the New York City Health and Hospitals Corporation on July 5, 2023.

25.    Defendants City of New York and New York City Health and Hospitals Corporation failed to serve timely demands for hearings pursuant to General Municipal Law 50-h.

26.    Further, the notice of claim requirement is excused in "actions that are brought to protect an important right, which seek relief for a similarly situated class of the public, and whose resolution would directly affect the rights of that class or group." *Green v. City of New York*, 438 F. Supp. 2d 111, 125 (E.D.N.Y. 2006).

27.    As set forth herein, the facts and circumstances satisfy this standard, and all plaintiffs as well as the members of the putative classes are therefore excused from the notice of claim requirement.

28.     Any and all other prerequisites to the filing of this suit have been met.

29.     Plaintiffs have exhausted all administrative remedies to the extent that they apply to the claims herein.

30.     Pursuant to the New York City Human Rights Law (NYCHRL) § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, thereby satisfying the notice requirements of that section.

## PARTIES

31.     Plaintiffs Anthony Bellere, Arthur Brown, Adones Betances, Steven Chirse, Ricardo Cisneros, Latik Edwards, Floyd Harden, Wagner Montero, Emiliano Rodriguez, Kabary Salem, Christopher Sanders, Alexe St. Fleur, Darryl Williams, Michael Harris, and David McCall are current and former pretrial and post-conviction detainees who are or were in the custody of the New York City Department of Corrections.

32.     Plaintiffs bring this action both individually, and on behalf of three classes of detainees more fully defined herein that suffered the same or similar harms based on the same or similar conduct of Defendants.

33.     At all times relevant referred herein, Defendant, City of New York ("City") was and is a municipal corporation organized under the laws of the State of New York.

34.     At all times relevant herein, The New York City Department of Corrections ("DOC") was a mayoral agency of the City.

35.     At all times herein, Defendant City was responsible for providing medical and behavioral health services to inmates and detainees in its correctional facilities.

36.     At all relevant times referred to herein, the City was responsible for providing shelter, food, supervision, education, recreation, and other services and amenities to inmates and detainees in its correctional facilities.

37.     At all relevant times referred to herein, the City's correctional facilities included the facilities collectively known as "Rikers Island" in the Bronx, New York.

38.     North Infirmary Command ("NIC") is the facility on Rikers Island where the City housed the named plaintiffs in the custody of DOC.

39.     At all relevant times referred to herein, the City was the employer of its co-Defendants, including the individual Defendants.

40.     The City was at all times relevant to this complaint, responsible for the policies, practices, and customs of the DOC and its agents, servants, employees, and contractors.

41.     Defendant Louis A. Molina was the Commissioner of DOC from January 1, 2023, until October 31, 2023. During this period, Molina was the final policy maker with respect to DOC. Molina's acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries. Molina is sued in his individual capacity.

42.     Defendant Lynelle Maginley-Liddie was appointed Commissioner of DOC on December 8, 2023, and since this date was and is the final policy maker with respect to DOC. Prior to taking this position, Maginley-Liddie was DOC First Deputy Commissioner. At all times relevant, Maginley-Liddie's acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries. Maginley-Liddie is sued in both her individual and official capacity.

43.     Defendant Ronald Brereton was appointed Deputy Commissioner of Security Operations for DOC in May 2022, and at all times thereafter, Brereton oversaw the Fire Safety

Unit and the Office of Security. Brereton's acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries. Brereton is sued in both his individual and official capacity.

44.     At all times relevant to this action, Defendant Charlton Lemon was a DOC employee and the Acting Assistant Chief of Security. Defendant Lemon was responsible for issuing and enforcing security memoranda and ensuring staff compliance with policies, procedures, directives, and memoranda and answered directly to the Deputy Commissioner of Security Operations for DOC. Acting Assistant Chief Lemon's acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries. He is sued in both his individual and official capacities.

45.     Defendant Christopher Currenti was at all relevant times referred to herein, a DOC employee and the Fire Safety Director for DOC. Defendant Currenti supervised the Fire Safety Unit and all of its operations and employees and developed and promulgated its policies, procedures, and directives. Defendant Currenti was present on April 6, 2023, and his acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries. He is sued in his individual capacity.

46.     Defendant Ronald Miller was at all relevant times referred to herein, a DOC employee and the Acting Warden of NIC, and the final policy maker for NIC. Defendant Miller was present on April 6, 2023, and his acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries. Warden Miller is sued in his individual and official capacities.

47.     Defendant Steven Ramkissoon was at all relevant times referred to herein, a DOC employee and the Deputy Warden of Security for NIC. Defendant Ramkissoon was present on

April 6, 2023, and his acts and omissions were both a but for and proximate cause of Plaintiffs'
and the Classes' injuries. He is sued in his individual capacity.

48.     Defendant Natalie Tawiah was at all relevant times alleged herein, a DOC
employee holding the rank of Assistant Deputy Warden (ADW).  Defendant Tawiah was present
on April 6, 2023, and acted as the Tour Commander during the incidents that occurred on that date
along with ADW Teresa Mack.  Defendant's acts and omissions were both a but for and a
proximate cause of Plaintiffs' and the Classes' injuries.  She is sued in her individual capacity.

49.     Defendant Teresa Mack was at all relevant times alleged herein, a DOC employee
holding the rank of Assistant Deputy Warden.  Defendant Mack was present on April 6, 2023, and
acted as the Tour Commander during the incidents that occurred on that date along with ADW
Tawiah.   Defendant's acts and omissions were both a but for and a proximate cause of Plaintiffs'
and the Classes' injuries.  She is sued in her individual capacity.

50.     Defendant Tehisa Skinner was at all relevant times alleged herein, a DOC employee
holding the rank of Captain.  Defendant Skinner was present on April 6, 2023, and her acts and
omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries.  She is
sued in her individual capacity.

51.     Defendant Krystal Forde was at all relevant times alleged herein, a DOC employee
holding the rank of Captain.  Defendant Forde was present on April 6, 2023, and her acts and
omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries.  She is
sued in her individual capacity.

52.     Defendant Nikema Harrell was at all relevant times alleged herein, a DOC
employee holding the rank of Captain. Defendant Harrell was present on April 6, 2023, and her

acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries. She is sued in her individual capacity.

53.     Defendant Jermain Phillips was at all relevant times alleged herein, a DOC employee holding the rank of correction officer.  Phillips was at all relevant times the Fire Safety Officer for NIC and was present on April 6, 2023.  Phillips' acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries. He is sued in his individual capacity.

54.     Defendant Dain Deallie was at all relevant times alleged herein, a DOC employee holding the rank of correction officer.  Deallie was at all relevant times assigned as the Key Control officer for NIC and was present on April 6, 2023.  Deallie's acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries. He is sued in his individual capacity.

55.     Defendant Shanel Whitfield was and is a Correction Officer employed by DOC and was present before and during the fire on April 6, 2023. Defendant Whitfield's acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries.  She is sued in her individual capacity.

56.     Defendant Tanoya Copeland was and is a Correction Officer employed by DOC and was present before and during the fire on April 6, 2023. Defendant Copeland's acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries.  She is sued in her individual capacity.

57.     Defendant Natiah Mayo was and is a Correction Officer employed by DOC and was present before and during the fire on April 6, 2023. Defendant Mayo's acts and omissions

were both a but for and proximate cause of Plaintiffs' and the Classes' injuries. She is sued in her individual capacity.

58.     Defendant John or Jane Doe Numbers 1 through 40, whose identities are currently unknown, were DOC employees holding the rank of Wardens, Deputy Wardens, Assistant Deputy Wardens, Captains, and Corrections Officer, who were involved in the events that took place in NIC on April 6, 2023, prior to, during, and after the fire at issue herein, as well as the fires on or about May 7, 2023, and July 17, 2023. These John or Jane Doe Defendants' acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries. They are sued in their individual capacity.

59.     At all relevant times referred to herein, Defendant New York City Health and Hospitals Corporation ("HHC") is a public benefit corporation organized under the laws of the State of New York.

60.     At all relevant times referred to herein, by agreement with the City, HHC was responsible for the provision of medical and mental health services to those in DOC custody, including Plaintiff.

61.     Defendant Mitchell Katz, M.D. is the president and chief executive officer of HHC. At all times relevant, Dr. Katz was and is the final policy maker for HHC. Dr. Katz's acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries. Dr. Katz is sued in his individual and official capacities.

62.     Defendant Eric Wei, M.D., is a Senior Vice President and the Chief Quality Officer for HHC. Dr. Wei is responsible for monitoring and overseeing the quality of care for HHC. Dr. Wei's acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries. He is sued in his individual and official capacities.

63.     At all relevant times referred to herein, HHC operated, maintained. And administered Correctional Health Services ("CHS"), a correctional health system for the provision of services to inmates in DOC custody.

64.     Defendant Patricia Yang was and is the Senior Vice President for CHS at HHC. At all times relevant, Dr. Yang was responsible for overseeing CHS and was its chief management officer. Dr. Yang's acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries.  Dr. Yang is sued in her individual and official capacities.

65.     Defendant Bipin Subedi, MD, was and is the Chief Medical Officer/Senior Assistant Vice President for HHC/CHS. At all times relevant, Dr. Subedi oversaw CHS's medicine, mental health, and pharmacy services. Dr. Subedi's acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries. Dr. Subedi is sued in his individual and official capacities.

66.     Defendant Nancy Arias, R.N., was and is the Chief Nursing Officer/Deputy Executive Director for HHC/CHS. At all times relevant, Arias was responsible for the planning, directing, and managing of CHS's Nursing and Infection Control Services. Defendant Arias's acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries.  She is sued in her individual and official capacities.

67.     Defendant Carlos Castellanos was and is the Chief Operations Officer/Deputy Executive Director for HHC/CHS. At all times relevant, Castellanos was and is responsible for overseeing all jail health operations. Defendant Castellanos's acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries. He is sued in his individual and official capacities.

68.     Defendant Zachary Rosner, M.D., is the Chief of Service, Medicine. At all times relevant, Dr. Rosner oversaw the provision of medical services, as well as the implementation of policies and practices related to the provision of care. Dr. Rosner's acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries.  Dr. Rosner is sued in his individual and official capacities.

69.     At all times relevant herein, Defendants Katz, Wei, Yang, Subedi, Arias, Castellanos, and Rosner were responsible for developing and maintaining policies, practices, procedures, protocols, and training to ensure inmates received proper medical care.

70.     The acts and omissions of Defendants Katz, Wei, Yang, Subedi, Arias, Castellanos, and Rosner were both a but for and proximate cause of the injuries and harms suffered by the Plaintiffs and the Class.

71.     Defendant Physician Affiliate Group of New York, P.C. ("PAGNY"), is a professional services corporation that provides staffing to all HHC facilities, including CHS.

72.     Defendant Edward Chew, M.D., is the Interim Chief Executive Officer of PAGNY, and a doctor in HHC's Harlem Hospital specializing in Emergency Medicine. In this capacity, he is the final policy maker for PAGNY and its standards for hiring, retention, and maintenance of personnel in HHC facilities. Dr. Chew's acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries. Dr. Chew is sued in his individual capacity.

73.     Defendant Richard Becker, M.D., was the Chief Executive Officer of PAGNY, on April 6, 2023, and continuing thereafter. In this capacity, he was the final policy maker for PAGNY and its standards for hiring, retention, and maintenance of personnel in HHC facilities. Dr. Becker's acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries. Dr. Becker is sued in his individual and official capacities.

74.     Defendants Lisa Choleff, M.D., Jayanta Ray, M.D., James Patrick, P.A., Guy Kelly, P.A., Parviz Rafaelmehr, M.D., Thomas Schwaner, P.A, Tahmina Sikder, M.D., Esperance Ndayishimiye, P.A., Iosif Shpits, M.D., Bernard Chukwuneke, M.D., Franklin De Jesus Mejia, M.D., were at all relevant times including April 6, 2023, and after, doctors and physicians assistants working in the clinic at NIC operated by CHS. The acts and omissions of these Defendants were both a but for and proximate cause of Plaintiffs' and the Classes' injuries. They are each sued in their individual capacities.

75.     Defendant Urgicare Medical Associates, P.C. ("Urgicare"), is a professional services corporation which contracts with HHC to provide medical services normally offered in a hospital emergency room.

76.     Defendant Frank Flores, D.O., is the Chief Executive Officer ("CEO") of Urgicare and worked at the Urgicare Center on Rikers Island. As CEO of Urgicare, Dr. Flores was the one of the final policy makers with regard to Urgicare, in addition to his acts and omissions with regard to operating the Urgicare Center on Rikers Island. Dr. Flores's acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries. Dr. Flores is sued in his individual and official capacities.

77.     Defendant Peter Wachtel, D.O., is the President and Director of Urgicare, and worked at the Urgicare Center on Rikers Island. In this capacity, Dr. Wachtel was the one of the final policy makers with regard to Urgicare, in addition to his acts and omissions with regard to operating the Urgicare Center on Rikers Island. Dr. Wachtel's acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries. Dr. Wachtel is sued in his individual and official capacities.

78.     Defendant Adam Litroff, D.O., was at all relevant times including April 6, 2023, and after, employed as a doctor at Urgicare. Dr. Litroff's acts and omissions were both a but for and proximate cause of Plaintiffs' and the Classes' injuries.  He is sued in their individual capacities.

## FACTUAL ALLEGATIONS

I.     *The April 6, 2023, Fire in NIC*

79.     NIC's original building is a seven-floor facility on Rikers Island that houses both older inmates and inmates in restrictive housing.

80.     The second and third floors of NIC contain the restrictive custody housing units, with a claimed capacity to hold 84 inmates in individual cells.

81.     Unlike inmates in general population who congregate in day rooms when outside of their cells, inmates in restrictive custody are only permitted to go into individual day rooms attached to their cells.

82.     The restrictive custody cells at NIC are commonly referred to as "the kennels" by inmates and staff because they resemble the way that stray dogs are housed.

83.     The inmates in restrictive custody are kept on 23- or 24-hour a day lockdown despite not having been convicted of any crime.

84.     DOC often claims that restrictive custody is necessary because the incarcerated individuals housed there are violent.  However, many of the Plaintiffs and the class members were housed in this area as a punishment because they had embarrassed or angered the DOC or because DOC is aware that the restrictive custody inmates may be targeted by its staff or other inmates.

85.     Many of the incarcerated individuals housed in restrictive custody have serious mental illnesses, the symptoms of which DOC and CHS have failed to adequately diagnose and treat.

86.     Instead, DOC keeps these incarcerated individuals locked away, punishing them for behavior caused by illnesses they cannot control.

87.     DOC claims that it can keep inmates in restrictive custody indefinitely.

88.     On April 6, 2023, Marvens Thomas was one such inmate.

89.     As of April 6, 2023, Thomas, a pretrial detainee, had been housed in restrictive units for 584 days, or almost twenty months.

90.     In the year prior to April 6, 2023, Thomas had started at least three fires in different incidents while in restrictive custody.

91.     While starting a fire in one's own cell is often a sign of serious mental illness, on Rikers Island, and especially in the restricted custody units, fire starting is also often a last-ditch effort get help, outside attention, or to protest conditions of confinement when traditional protests like filing grievances, banging on cell walls so that the surveillance cameras vibrate, littering the walkway with food waste (also known as "trashing"), or flooding the walkways with water (also known as "flooding" or "flooding the cell"), have gone unheeded

92.     As noted by the federal monitor in *Nunez, et al. v. City of New York, et al.*, 11 CV 5845 (LTS) (JCF), in its April 18, 2024, report, "fires in a custodial setting are particularly dangerous and are typically indicators of discontent among people in custody."[1]

93.     All of these behaviors are used to notify officers and supervisors who monitor the surveillance video from the facility that something is wrong, to get an officer to come to the

---

[1] April 18, 2024, Status Report of the *Nunez* Independent Monitor at *40.

housing unit to address their concerns and/or emergencies, and/or to protest their mistreatment and civil rights violations.

94.     On April 6, 2023, Marvens Thomas was housed in a cell in Tier 2A, or side A of the second floor of NIC.

95.     The fire that Marvens Thomas set on April 6, 2023, burned out of control until the smoke reached the Plaintiffs who were held on other floors of the building.

96.     The April 6, 2023, fire was at least the fourth fire Mr. Thomas had set under similar circumstances in less than one year.

97.     FDNY was not notified of any of the prior fires set by Marvens Thomas even though the one on January 25, 2023, had required the use of a firehose to extinguish.

98.     The DOC refers to these firers as "still fires" a wholly unscientific term they appear to have invented to refer to a fire that did not advance beyond the initial area where it was set.

99.     The misnomer of referring to these events as "still fires" encourages staff to treat them without due regard for the ability of any fire no matter how "still" to burn out of control if not handled as an emergency.

100.    Defendants knew that Mr. Thomas had a penchant for setting fire to his cell in response to acts by DOC staff that he perceived to be abusive, improper, or unlawful.

101.    Instead of ensuring that Mr. Thomas received adequate supervision, and medical and mental health care, Defendants antagonized Mr. Thomas knowing he would respond how he always did and then abandoned their posts while the unit burned.

102.    At approximately 8:30 a.m. on the morning of April 6, 2023, a team of approximately 25 officers and supervisors from DOC's Emergency Services Unit converged on NIC to conduct an invasive and unlawful search of the inmates throughout the building.  During

the so called "special search" the officers removed personal property such as clothing and shoes from many incarcerated individuals.

103.    At approximately 10:45 a.m., the unlawful "special search" party arrived at Tier 2A where they remained until approximately 12:45 p.m.

104.    Mr. Thomas was predictably upset and agitated when the officers took what they deemed "non-institutional footwear" from Mr. Thomas.

105.    Mr. Thomas, the other incarcerated individuals in Tier 2A, and others throughout the building were agitated and upset.

106.    In fact, at approximately 11:20 a.m., as Tier 2A was still being searched, a fire was set by an inmate on a different Tier in NIC.

107.    Some of the incarcerated individuals were also upset because they believed that the search was performed intentionally so that DOC staff could ensure that the kennel where these men were kept in unlawful 23-hour or 24-hour a day lock downs could not be visited by a group of politicians who were said to be inspecting the facilities that day.

108.    After the search was complete, the inmates were furious and upset.

109.    Defendants Tawiah, Skinner, Phillip, and Deallie engaged in what they claimed were "de-escalation" talks with those in 2A including Mr. Thomas.

110.    Defendants knew that the inmates' options to seek redress were limited because they were locked in their cells day in and day out, and while they could call 311 to make a grievance, the DOC's grievance system is widely regarded as an unmitigated failure by inmates and experts.

111.    Defendants Tawiah, Skinner, Phillip, Deallie, Whitfield, and others knew the inmates would engage in flooding and trashing the tier because they were frustrated, angry, upset, and had trouble regulating their emotions and few other options.

112.    Instead of calling the mental health professionals or the chaplains on staff to assist in deescalating the situation Tawiah, Skinner, Phillip, and Deallie, left Whitfield to handle the tier while the inmates began throwing food out of their slots and flooding their cells.

113.    In response, Whitfield, who is a uniformed law enforcement officer, refused to conduct her regular 30-minute housing tours because she was afraid of getting "splashed" by the inmates which is a practice of throwing liquid like a beverage, or something more unsavory like a cup of urine at or near an officer.

114.    Instead of disciplining Defendant Whitfield and replacing her in the post with an officer capable of carrying out their sworn duties, Defendants Forde and Skinner told Whitfield that she did not have to do her tours until she was replaced.

115.    Defendant Whitfield locked the door to Tier 2A and never attempted to check on the inmates inside until after the fire had started hours later.

116.    No other officer was assigned.

117.    Around 12:50 pm, several inmates began flooding their cells.

118.    The flooding resulted in visible puddles in the walkway of Tier 2A.

119.    Another inmate began "trashing" the area including sliding food waste under their cell doors into the walkway.

120.    The flooding and trashing of 2A would have been visible to anyone who viewed the many surveillance cameras or anyone who entered the unit.

121.    The incarcerated individuals can be seen on the video banging on the cells causing the cameras to shake.

122.    This too would have been audible to anyone in the area including Copeland and Whitfield.

123.    At approximately 1:15 p.m., Thomas started a fire in his cell.

124.    Thomas used what is commonly referred to as a "prison lighter" to ignite flammable material in his cell.

125.    A prison lighter is easily made by taking a common household battery and holding a thin piece of metal (usually a piece of foil or a portion of stripped wire) to each end and bending the mid-point of the foil to a point.  The foil becomes hot enough to ignite flammable materials like toilet paper, from which a larger fire can be built.

126.    Prison lighters are commonplace in prisons across the country where inmates and detainees use them to light cigarettes and other smokable items.

127.    Thomas can be seen on the video being passed or "kited" an item, likely a battery pack, prior to lighting the fire:



128.    Thomas was able to receive batteries via kite (an item is tied to a string and slid towards its target recipient), even though he had already set multiple fires using batteries, because the inmates in 2A knew no one was watching the cameras and that no one was touring their tier.

129.    According to reports, Thomas then lit various items in his cell on fire, including tissues, clothing, and blankets.

130.    The fire spread and burned all four walls in the cell, the ceiling, and the floors as demonstrated in the photos below:

 

 

131.    The practice of using prison lighters, including to set fires within DOC's prisons, was well known to Defendants.

132.    Defendants, including Defendant Lemon, were aware that many of the fires prior to April 6, 2023, were set using batteries.

133.    The day after the April 6, 2023, fire Defendant Lemon issued the below security memorandum:



134.    Defendants nonetheless failed to stop the subsequent fires including the fire on July 17, 2023, which was also set with a prison lighter.

135.    Instead of admitting to a security failure, and to detract from Defendants' liability, Defendant Phillips instead claimed that he could not determine how the July fire was set.

136.    The first alarm on April 6, 2023, was triggered at 1:15 p.m. and alerted the FSU division that there was a smoke condition in NIC Tier 2A.

137.    It is unclear where Defendant Whitfield was and what she was doing while the fire was ignited but she was not visible on camera anywhere near her assigned post.

138.    The audible fire alarms in NIC had been disabled for some time and no audible fire alarm sounded in the building.

139.    Notably, Plaintitffs report that after the April 6, 2023, fire, the alarms were turned back on for a short period of time and then turned off again, likely because they were constantly sounding.

140.    By 1:16 p.m. the smoke alarm system in NIC was signaling that smoke had spread to other units in the building and was in the ducts.

141.    The FSU office failed to acknowledge the alarm until

142.    Defendant Copeland was the first person in NIC to notice the fire at 1:27 p.m. almost 15 minutes after the fire was allegedly started.



143.    Defendant Copeland notified Defendant Whitfield and a John Doe Defendant.

144.    Defendant Whitfield opened the door to 2A but did not evacuate any of the inmates.

145.    Instead, Defendant Whitfield began indiscriminately squirting a water can (a fire extinguisher filled with water) at the floor in the hallway of Tier 2A before she ever reached Thomas' cell.



146.    Even had Whitfield properly aimed the water can, it appeared to be empty or almost empty and upon noticing this, Whitfield retreated from the smoke-filled tier without attempting to evacuate the inmates.

147.    Defendants Phillips and Deallie arrived and also tried to use the water cans to no avail.

148.    Phillips and Deallie then tried to use the fire hose but instead tangled it and left it in a pile on the floor at around 1:30 p.m.

149.    No one present attempted evacuate any of the men trapped in their cells.

150.    No one had called 911.

151.    DOC has a policy or practice and custom of delaying or refusing to call FDNY to respond to arsons and/or to investigate the root cause of incidents of arson within Rikers Island.

152.    DOC does not call FDNY for fires it deems to be "still fires" and does not evacuate inmates but permits the correction officer who notices the fire to extinguish it with whatever extinguisher is available.

153.    Smoke filled the entire second floor of NIC.

154.    The John and Jane Doe Defendants on the Probe Team appeared in the area along with Defendant Skinner but did not enter the tier.

155.    Smoke entered numerous air ducts.

156.    Smoke went throughout NIC and filled the floors above.

157.    As DOC was aware, the Building Management System in NIC had been malfunctioning for some time, and as such, the ventilation system did not close the dampers or shut down fans to stop smoke from spreading to other parts of the building.

158.    Nor were the fire sprinklers active because DOC had shut the water off so long before the fire that no one could recall how long the tier had been without fire protection.

159.    People housed on other parts of the second floor and on the third, fourth, fifth, and sixth floors were exposed to heavy smoke conditions.

160.    While the fire burned and smoke permeated the building, DOC personnel at NIC left all the inmates locked in their cells or dormitories.

161.    By 1:32 p.m. all defendants had retreated from the area, leaving the inmates locked in their cells.

162.   Indeed, the smoke on the second floor became so heavy that security cameras had zero visibility and stopped recording for about seven minutes until the second floor was vented by propping open exterior doors.

163.   The seven minutes when the cameras did not record represent seven minutes when the smoke on the second floor was so heavy nothing in the area could be detected by the surveillance system.

164.   Two screenshots of video of Tier 2A demonstrating the smoke condition just before the camera stopped filming and immediately after it began again when the second floor was ventilated are included below:



165.    Despite claims made by certain Defendants that 911 was called within six minutes of the first smoke alarm, records demonstrate that FDNY did not receive a 911 call from DOC until 1:34 p.m.

166.    This is consistent with DOC's pattern and practice of failing to call FDNY unless DOC staff have first tried and failed to extinguish a fire themselves which ensures that FDNY's response time will be significantly delayed.

167.    The DOC never ventilated the other housing units in the building and left the Plaintiffs who were housed on those floors to breathe smoke until it finally settled and left a residue of fine, toxic, particulate matter all over the building.

168.    The smoke emitted in a structure fire consumes the oxygen in the free air which causes suffocation, loss of consciousness, and death within minutes.

169.    Moreover, the smoke emitted in a structure fire is also toxic, and includes carbon monoxide, hydrogen cyanide, and can contain other toxic and carcinogenic byproducts of the combustion process depending on what is burned to fuel the fire.

170.    The toxins and particulate matter (sometimes referred to colloquially as "soot") contained in smoke can cause acute and chronic injury and death.

171.    Moreover, the superheated particulate matter expelled in smoke can cause tissue damage to the airway mucosa and lungs.

172.    In fact, after the April 6, 2023, fire, the DOC's FSU disseminated the below informational one sheet urging inmates to stop setting fires to protest their unlawful conditions of confinement:




**New York City Department of Correction**
**Fire Safety Unit**
## DANGERS OF CELL FIRES/ARSON

When you start a fire in your cell or anywhere else, while in DOC custody, you are putting yourself and all building residents/occupants at risk of smoke inhalation/serious injury and even death.

It is against the law to intentionally start a fire and can result in being charged with arson in the second degree, a class B felony.  **NYS Penal Code 150.15** Arson in the second degree is a class B felony.

### THE EFFECTS OF CELL FIRES AND SMOKE

The inhalation of smoke released from a "nuisance cell fire" can cause serious health issues to you and those who live and work around you that include:

- Damage to the windpipe, breathing passages and lungs
- Obstructing proper air flow to the lungs
- Carbon monoxide poisoning
- Toxic chemical poisoning
- Long term effects to lung capacity and breathing capability
- Most deaths during a fire are a result of smoke inhalation

Inhalation of chemicals released from the smoke are also cancerous and can have long term effects in your body for years to come.

Starting an intentional cell fire is not only illegal but very dangerous to the health and safety of you and others who reside around you.

173.     The fire burned for almost a half hour before eight of the inmates in Tier 2A began to be evacuated.

174.     These inmates were moved to another part of the second floor, to Tier 2B where they were held for an extended period of time before being evaluated by medical staff.

175.     Regardless of where these individuals were moved within NIC, they continued to inhale smoke and toxic particulate matter.

176.     Plaintiffs who were in 2C and the floors above the fire were never evacuated.

177.    DOC personnel, on the other hand, opened fire doors at the ends of hallways and stood around the building on external fire stairs and caged catwalks breathing fresh air while the people in their custody were forced to breathe toxic smoke.

178.    Worse still, following the April 6, 2023, fire, many of the Plaintiffs, especially those housed in restrictive custody units have been exposed to further fires, including on May 7, 2023, and July 17, 2023, in NIC.

179.    During subsequent fires, DOC engaged in the same unconstitutional, unlawful, injurious, and potentially deadly, refusal to evacuate the Plaintiffs.

*Individual Plaintiffs*

180.    On April 6, 2023, Plaintiff Arthur Brown was housed in Tier 2C in NIC.

181.    At that time, Mr. Brown was a pretrial detainee.

182.    Like the cells in Tier 2A, the cells in Tier 2C are individual cells that open into individual day room cells and are referred to as kennels. When the fire occurred on April 6, 2023, Mr. Brown was locked in his cell/day room.

183.    Mr. Brown was exposed to the smoke that poured out of Tier 2A into the rest of NIC.

184.    At first, Mr. Brown smelled paper burning.

185.    Next, he smelled the smoke itself.

186.    The smoke got heavy in the housing area.

187.    As a result, Mr. Brown could not see or breathe.

188.    Mr. Brown instinctively wet a towel and wrapped it around his face and laid down on the floor to try to avoid breathing in the smoke, but it was impossible to avoid.

189.    Mr. Brown started hyperventilating, his chest hurt, and he became lightheaded.

190.  Around the housing area the men locked in their cells were screaming.

191.  Despite the clouds of smoke filling the housing area, Defendants kept Mr. Brown locked in his cell.

192.  As a result, Mr. Brown was forced to inhale the toxic smoke emanating from Tier 2A.

193.  As a result of the fire, Mr. Brown had soot in his nose, throat, and lungs.

194.  As a result of the fire, Mr. Brown coughed up soot-tinged sputum.

195.  Mr. Brown had a burning sensation in his nose and throat.

196.  After the fire, Mr. Brown experienced symptoms consistent with smoke inhalation injuries, including heavier breathing than usual, feeling more tired than usual, shortness of breath, headaches, dizziness, lightheadedness, tachycardia, increased anxiety, nightmares, pain or burning in his eyes, and persistent dryness of mouth.

197.  After the fire, Mr. Brown requested medical attention or treatment from a correction officer in the tier.

198.  Mr. Brown received no medical attention in response to this request.

199.  Mr. Brown was still housed in NIC Tier 2C on or about May 7, 2023, when an inmate on his tier started a fire.

200.  Mr. Brown was again exposed to smoke from the fire.

201.  Mr. Brown was still housed in NIC Tier 2C on or about July 17, 2023, when an inmate on his tier started a fire.

202.  The fire caused smoke to permeate through Tier 2C.

203.  The smoke was so heavy it obscured the light in the Tier.

204.    Despite the accumulation of smoke, DOC personnel, including Defendants, Phillip, and John and Jane Doe Defendants again, kept Mr. Brown locked in his cell.

205.    As a result, Mr. Brown was forced to inhale smoke and soot created by the fire.

206.    As a result, Mr. Brown experienced similar and/or worsened sequelae to those which plagued him following the April 6, 2023, fire.

207.    Black flecks of particulate matter floated through the air in the Tier following the fire and were never cleaned.

208.    Prior to April 6, 2023, Mr. Brown was exposed to fire and smoke in Tier 2B of NIC in 2020.

209.    Prior to April 6, 2023, Mr. Brown was exposed to heavy smoke as a result of a fire lit by an inmate in the George R. Vierno Center ("GRVC"), another DOC facility on Rikers Island.

210.    During this fire, black smoke saturated Mr. Brown's cell and blocked the light.

211.    As a result of these experiences, Mr. Brown suffers physical and emotional effects, including headaches and nightmares.

212.    Mr. Brown's pulse increases whenever he smells burning.

213.    Mr. Brown also experiences flashbacks of being trapped in a burning building.

214.    On April 6, 2023, Latik Edwards was housed in Tier 2C of NIC in a row of cells with some of the other Plaintiffs including Mr. Brown.

215.    At the time of the April 6, 2023, fire, Mr. Edwards was a pretrial detainee.

216.    When the smoke from the fire entered Tier 2C, Mr. Edwards was engulfed in a thick black cloud of hot air.

217.    Mr. Edwards had difficulty breathing.

218.    Mr. Edwards' vision became blurry.

32

219.    During the April 6, 2023, fire, Defendants kept Mr. Edwards locked in his cell despite the dangerous smoke condition.

220.    The correction officers in the unit said they would evacuate the inmates, but they never followed through on that promise.

221.    As a result, Mr. Edwards suffered smoke exposure because he was not removed and evacuated from the tier and NIC.

222.    After the fire Mr. Edwards asked his Defendant floor officer to see a doctor.

223.    On April 6, 2023, no doctor would examine Mr. Edwards.

224.    As a result of the fire, Mr. Edwards had soot in his nose and mouth.

225.    He experienced burning and discomfort in his nose and throat, including the sensation that something was stuck in his throat that could not be cleared.

226.    Mr. Edwards developed a cough, had trouble breathing, was wheezing, felt fatigued and experienced dizziness, lightheadedness, unusual changes in his heart rate, eye discomfort, and other physical effects.

227.    On April 7, 2023, Mr. Edwards was examined by Defendant Jayanta Ray, MD.

228.    Despite requesting a medical visit because he was experiencing numerous symptoms from his smoke inhalation, Dr. Ray claimed that Mr. Edwards reported no injuries, had no symptoms, and assessed his injury as "unspecified."

229.    Dr. Ray knew these statements were not true as Mr. Edwards had reported that his symptoms were caused by his smoke inhalation.

230.    Worst of all, Dr. Ray sent Mr. Edwards back to his housing unit, despite the unsafe and unsanitary conditions caused by the soot and residue that was not cleaned after the fire.

231.    Dr. Ray refused to order follow-up testing or treatment.

232.    Mr. Edwards again saw Dr. Ray on April 13, 2023.

233.    Again Dr. Ray failed to address Mr. Edwards' symptoms from smoke exposure but ordered Mr. Edwards an "unspecified" medical follow-up.

234.    More importantly, Dr. Ray ordered Mr. Edwards' blood pressure and vitals to be checked, although Dr. Ray's records fail to note any issue other than an alleged pollen allergy.

235.    Mr. Edwards' vitals were not checked until April 20, 2023.

236.    On that date, Defendant James Patrick performed the vitals check and thereafter claimed that Mr. Edwards had seasonal allergies and prescribed him allergy medication.

237.    On May 7, 2023, Mr. Edwards had a medical visit with Defendant Guy Kelly after being exposed to the May 7, 2023, fire.

238.    Only then did Defendant Kelly note that Mr. Edwards was suffering from smoke inhalation.

239.    Like Dr. Ray, Defendant Kelly failed to examine or treat Mr. Edwards for smoke inhalation.

240.    Kelly continued to treat Mr. Edwards as if he was suffering from seasonal allergies rather than investigating and treating the numerous serious illnesses and injuries that occur with smoke inhalation.

241.    Defendant Patrick saw Mr. Edwards on May 9, 2023.

242.    Patrick claimed Mr. Edwards complained of seasonal allergies and nothing else and ordered further allergy medication.  That was untrue.

243.    On May 18, 2023, Defendant Franklin De Jesus Mejia visited Mr. Edwards at his cell.

244.    Dr. Mejia ordered Mr. Edwards' allergy medication.

245.    On or about July 17, 2023, Mr. Edwards was injured when he was exposed to another fire within NIC which created toxic smoke that he was forced to breathe.

246.    In the days following the July 17, 2023, fire, Mr. Edwards reported difficulty breathing, coughing or spitting up blood and black mucus; blurry vision from smoke; and soot in his nose.

247.    On July 17, 2023, Defendant Parviz Rafaelmehr briefly examined Mr. Edwards following his further smoke inhalation.

248.    Defendant Rafaelmehr failed to conduct the necessary evaluation of Mr. Edwards.

249.    Defendant Rafaelmehr directed that Mr. Edwards be returned to the clinic if necessary.

250.    Despite Rafaelmehr's instructions, Mr. Edwards was not returned to the clinic despite necessity.

251.    On July 19, 2023, Defendant Thomas Schwaner saw Mr. Edwards during sick call rounds.

252.    At that time, Mr. Edwards continued to complain of symptoms of smoke inhalation, including persistent headache and lightheadedness.

253.    Rather than treat Mr. Edwards for smoke exposure, Schwaner assessed Mr. Edwards as having "Headache – unspecified."

254.    Schwaner entered for Tylenol.

255.    On July 24, 2023, Mr. Edwards returned to the clinic to renew his Tylenol prescription.

256.    In other words, Mr. Edwards' headache from the smoke continued.

257.    Defendant Patrick merely renewed the Tylenol prescription without attempting to assess Mr. Edwards for his ongoing symptoms related to the inhalation of toxic smoke.

258.    Mr. Edwards continues to experience symptoms from his exposure to toxic smoke.

259.    On April 6, 2023, Wagner Montero was housed in Tier 2C, the same Tier as Mr. Brown and Mr. Edwards.

260.    While in the City's custody, Mr. Montero's name was incorrectly recorded as Wagner "Argamonte" instead of Wagner Montero.

261.    April 6, 2024, was Mr. Montero's birthday.

262.    At the time of the fire, Mr. Montero was lying in his bed.

263.    Like the other men in Tier 2C that day, DOC personnel, including Defendants, kept Mr. Montero locked in his cell as smoke from the April 6, 2023, fire filled the unit.

264.    As a result of being forced to inhale smoke on April 6, 2023, Mr. Montero had soot in his nose and mouth, and coughed up soot and other material.

265.    Mr. Montero vomited multiple times and then, at some point during the fire, Mr. Montero lost consciousness.

266.    Following the fire, Mr. Montero experienced a burning sensation in his nose and throat, had the sensation of something being stuck in his throat.

267.    Mr. Montero also experienced fatigue, shortness of breath, wheezing, headaches, dizziness, lightheadedness, tachycardia, feeling like his heart skipped beats, increased feelings of anxiety, nightmares, eye irritation, and other affects from the smoke exposure.

268.    Mr. Montero requested medical attention following the fire.

269.    Indeed, a number of men in Tier 2C called out for medical assistance to the correction officers on the night of April 6, 2023.

270.   Defendants responded by dismissing the idea that the inmates did in fact need medical attention despite the fact that a number of Corrections employees, including some Defendants, had claimed injury from far less smoke exposure than suffered by the Plaintiffs.

271.   Following the fire, Defendant Esperance Ndayishimiye saw Mr. Montero.

272.   Ndayishimiye claimed that Mr. Montero had no sign or injury, and only wanted his blood pressure checked.  That was untrue.

273.   Ndayishimiye failed to perform the necessary examination and testing for someone who had been immersed in smoke from a fire.

274.   On May 7, 2023, Mr. Montero was again exposed to smoke from a fire.

275.   Mr. Montero requested medical attention.

276.   Despite a request from Mr. Montero for medical attention, Defendant Kelly claimed that Mr. Montero refused medical attention for religious reasons.  That was untrue.

277.   Neither Kelly nor DOC personnel documented the treatment refused by Mr. Montero.

278.   On June 11, 2023, Mr. Montero experienced lightheadedness, dizziness, and palpitations.

279.   Mr. Montero was diagnosed with supraventricular tachycardia (SVT), a serious heart condition.

280.   SVT can be caused by carbon monoxide or cyanide poisoning.

281.   As a result, Mr. Montero was taken to Bellevue Hospital where he remained for four days until June 16, 2023.

282.   There, on June 14, 2023, Mr. Montero underwent heart surgery, specifically supraventricular tachycardia ablation.

283.    Despite his new, serious medical diagnoses, and recent surgery, Mr. Montero was taken back to the same cell in NIC which had not been cleaned of any soot.

284.    On July 17, 2023, Mr. Montero was again exposed to smoke from fire when Defendants refused to evacuate him when heavy smoke filled the unit.

285.

286.    After the fire, Mr. Montero was found in his cell, non-responsive, with shallow breathing and had hit his head against a wall when he lost consciousness.

287.    Defendant Rafaelmehr administered Narcan to Mr. Montero, despite the fact that there was no indication he had taken, let alone overdosed on a narcotic and the clear knowledge that Mr. Montero had SVT and was again exposed to toxic smoke.

288.    Mr. Brown and some of the other Plaintiffs yelled at the medical staff for behaving so negligently when they were aware that Mr. Montero had once again been exposed to a fire while he was still suffering from SVT.

289.    He was taken to the NIC clinic, where he was found to have large amounts of blood in his nose.

290.    Defendant Rafaelmehr claimed that Mr. Montero showed no signs of smoke inhalation, despite identifying that Mr. Montero had blood clots in his nose, was tachycardic, and that Mr. Montero was unconscious after the fire.

291.    EMTs arrived to take Mr. Montero to Elmhurst Hospital.

292.    Staff at NIC failed to tell the EMTs who responded that Mr. Montero had been in a fire, nor that he had inhaled large amounts of smoke when they refused to evacuate him.

293.    During his hospitalization, Mr. Montero, who was only twenty-three at the time, was found to have a nodule growing in the left upper lobe of his lung and small lesions on his liver.

294.   The Medical Defendants never sought appropriate follow-up testing for Mr. Montero's lesions and nodule to determine if they were cancerous or indicative of poisoning from his extensive smoke exposure.

295.   Mr. Montero was exposed to a fire prior to April 6, 2023, when he was housed in Anna M. Kross Center ("AMKC"), another DOC facility on Rikers Island.

296.   On or about April 6, 2023, Christopher Sanders was incarcerated at NIC on Rikers Island.

297.   Mr. Sanders was housed in Tier 2C.

298.   Like the other individuals housed in Tier 2C, Mr. Sanders was exposed to the heavy smoke conditions created by Thomas' fire.

299.   Like the other individuals in Tier 2C that day, DOC personnel, including John and Jane Doe Correction Officers, Captains, and Assistant Deputy Wardens, kept Mr. Sanders locked in his cell as smoke from Thomas's fire filled the unit.

300.   As a result, Mr. Sanders was forced to inhale the smoke from the fire.

301.   As a result of being forced to inhale smoke, Mr. Sanders coughed up blood, felt like he could not catch his breath, had increased headaches, felt like his heartbeat faster and skipped beats.

302.   On April 6, 2023, Mr. Sanders requested medical assistance.

303.   Dr. Ray saw Mr. Sanders the next day, April 7, 2023.

304.   Dr. Ray assessed Mr. Sanders with a cough, prescribed him an expectorant and ordered him a chest x-ray.

305.    Dr. Ray failed to diagnose Mr. Sanders with smoke exposure, nor did they order Mr. Sanders the required range of tests and examinations even though he was manifestly suffering from this condition.

306.    On April 8, 2023, Mr. Sanders saw Defendant Kelly.

307.    Kelly noted that Mr. Sanders suffered from a sore throat since the day before.

308.    Kelly ordered Mr. Sanders a COVID test, ignoring the fact that Mr. Sanders was suffering from smoke exposure.

309.    As of April 10, 2023, Mr. Sanders had not yet received the chest X-Ray ordered on April 7, 2023.

310.    On April 10, 2023, Mr. Sanders reported suffering continued chest pain to Defendant Iosif Shpits.

311.    Shpits gave Mr. Sanders no treatment and sent him back to his housing unit without properly evaluating his chest pain.

312.    On April 12, 2023, Mr. Sanders finally received an X-Ray of his chest from Urgicare.

313.    On May 2, 2023, Mr. Sanders again saw Dr. Ray and reported that he continued to experience chest pain.

314.    On May 6, 2023, Mr. Sanders reported to Dr. Chukwuneke that he had chest pain.

315.    On May 7, 2023, Mr. Sanders was again exposed to smoke from a fire in NIC.

316.    Mr. Sanders was seen by Defendant Kelly that day.

317.    Mr. Sanders reported he experienced tightness in his chest.

318.    Kelly failed to properly examine Mr. Sanders.

319.    In fact, absent from Kelly's notes of the examination are any indications that Kelly examined Mr. Sanders airways, or lungs.

320.    Kelly provided no treatment, nor any order or referral, for smoke inhalation.

321.    On May 21, 2023, Mr. Sanders again experienced chest pain.

322.    Mr. Sanders saw Dr. Tahmina Sikder.

323.    Dr. Sikder told Mr. Sanders to eat and drink plenty of fluids.

324.    On July 17, 2023, Mr. Sanders was again exposed to smoke and fire in Tier 2C.

325.    Mr. Sanders continued to suffer the effects of smoke exposure and inhalation, but Defendants have failed to provide proper treatment.

326.    On or about April 6, 2023, Mr. Alexe St. Fleur was incarcerated at NIC on Rikers Island.

327.    While in the City's custody, Mr. St. Fleur's name was incorrectly recorded as "Stanley LaFleur" instead of Alexe St. Fleur.

328.    Mr. St. Fleur was housed in Tier 2C of NIC at that time.

329.    Mr. St. Fleur suffers from chronic asthma for which he requires a nebulizer.

330.    At the time of the fire on April 6, 2023, Mr. St. Fleur was watching television in his cell.

331.    The windows in the tier were closed.

332.    Smoke came in and the housing area became dark.

333.    Like the other individuals in Tier 2C on April 6, 2023, DOC personnel, including Defendants kept Mr. St. Fleur locked in his cell as smoke from Thomas's fire filled the unit.

334.    During the fire, Mr. St. Fleur witnessed the floor officer abandon their post in Tier 2C and leave all the inmates in the cells as the Tier filled with smoke.

41

335.    As a result, Mr. St. Fleur was forced to inhale the smoke from the fire.

336.    Mr. St. Fleur became dizzy and felt like he would pass out.

337.    He began to experience an asthma attack.

338.    Mr. St. Fleur saw an inmate two cells away pass out.

339.    Mr. St. Fleur vomited three times after inhaling the smoke.

340.    Mr. St. Fleur had soot in his nose and mouth and coughed up soot after the fire.

341.    Mr. St. Fleur experienced a range of problems from the smoke exposure, including with breathing and with his heart rate, feelings of fatigue, dizziness, lightheadedness, nausea, increased headaches, and nightmares.

342.    Mr. St. Fleur needs higher doses of nebulizer to treat his asthma following the fire.

343.    Mr. St. Fleur saw Dr. Ray on April 7, 2023, for smoke exposure.

344.    Dr. Ray failed to examine or direct testing of Mr. St. Fleur and returned him to his housing unit.

345.    Dr. Ray sent Mr. St. Fleur back to his housing unit even though they knew Mr. St. Fleur suffered from asthma, and that the air and surfaces of the housing unit were poisoned with the smoke residue and particulates from the fire the day before.

346.    On May 7, 2023, Mr. St. Fleur remained housed in Tier 2C of NIC.

347.    On that date, Mr. St. Fleur was again exposed to smoke during a fire.

348.    On May 7, 2023, Mr. St. Fleur saw Defendant Kelly.

349.    Like the others who visited Kelly that day, Kelly failed to perform any examinations or testing on Mr. St. Fleur.

350.    On or about July 17, 2023, Mr. St. Fleur continued to be housed in Tier 2C of NIC.

351.    Like the other in Tier 2C, Mr. St. Fleur was exposed to smoke because of a fire.

352.     DOC personnel, including Defendant Phillip and John and Jane Doe Correction Officers, Captains, and Assistant Deputy Wardens, kept Mr. St. Fleur locked in his cell as smoke from the fire filled the unit.

353.     Mr. St. Fleur was forced to remain locked in his cell breathing the toxic and polluted air, despite the actual and/or constructive knowledge of numerous Defendants.

354.     On July 17, 2023, Mr. St. Fleur saw Defendant Rafaelmehr.

355.     Defendant Rafaelmehr failed to perform a proper examination or testing of Mr. St. Fleur for smoke exposure.

356.     Indeed, Defendants Ray, Kelly, and Rafaelmehr completed records of each visit that are near identical to other plaintiffs in this matter and fail to note any inquiry or investigation related to Mr. St. Fleur's asthma.

357.     On or about April 6, 2023, Mr. Anthony Bellere was incarcerated at NIC.

358.     He was housed in Area 6B at NIC.

359.     Housing Area 6B is located on the sixth floor.

360.     On April 6, 2023, Mr. Bellere was watching television in the dayroom.

361.     At that time, smoke entered the dayroom.

362.     The smoke impaired Mr. Bellere's vision.

363.     The smoke also made it difficult to breathe.

364.     Mr. Bellere went to the front of the housing area where Defendant CO Mayo was located.

365.     CO Mayo left the residents of Housing Area 6B locked in the unit while she exited the building.

366.    Before abandoning the men of Housing Area 6B, CO Mayo gave them common paper face masks.

367.    The masks were ineffective protection against the harms and dangers posed by smoke.

368.    After the fire, Mr. Bellere had a large amount of soot in his nose.

369.    After the fire, his nose was clogged and congested, and he had nose bleeds.

370.    On April 6, 2023, the staff from the clinic left Rikers Island.

371.    To request medical attention in DOC custody, inmates are required to make a "sick call."

372.    Mr. Bellere tried to make sick calls related to the effects of the fire but the personnel answering the phone consistently hung up the phone when he told them he was calling about smoke inhalation injuries.

373.    Three weeks after the fire on April 25, 2023, nurses finally entered a sick call visit for Mr. Bellere.

374.    Mr. Bellere reported on April 25, 2023, that his nose was clogged during the previous three weeks since the fire.

375.    On April 26, 2023, Mr. Bellere visited Defendant Dr. Schwaner.

376.    Dr. Schwaner's record indicates that Mr. Bellere reported nasal congestion and itching since smoke exposure three weeks before.

377.    Dr. Schwaner assessed Mr. Bellere for rhinitis and prescribed nasal spray.

378.    Dr. Schwaner failed to examine or treat Mr. Bellere for smoke exposure.

379.    After the fire, DOC failed to clean and remediate the housing area.

380.    The inmates were forced to clean the facility themselves.

381.    Consequently, the individuals in the housing area were exposed to particulate and other harmful substances that were reintroduced into the air of the facility without proper precautions.

382.    Moreover, DOC failed to supply new bed linen for two weeks.

383.    In turn, Mr. Bellere and his fellow inmates were forced to sleep in bedding that was impregnated with soot, particulate and other effects of the fire.

384.    Mr. Bellere continues to experience the effects of smoke exposure, including persistent cough.

385.    Mr. Bellere is currently being evaluated for chronic obstructive pulmonary disease (COPD).

386.    On April 6, 2023, Mr. Adones Betances was incarcerated at NIC on Rikers Island.

387.    Mr. Betances was assigned to Housing Area 6B.

388.    Mr. Betances was a pretrial detainee.

389.    Mr. Betances suffers from asthma.

390.    On April 6, 2023, Mr. Betances was returning from recreation through a hallway with thick black smoke.

391.    Despite the smoke collecting throughout the building and in his housing unit, Mr. Betances was nonetheless put back in 6S.

392.    Black smoke was entered the housing unit.

393.    Because there were multiple recreation yards, Mr. Betances asked CO Mayo and other John and Jane Doe Correction Officer Defendants if they could be taken out to the yard.

394.    These defendants refused.

395.    They provided the aforementioned common face masks.

396.    They told Mr. Betances and others they could do noting for the men in 6S.

397.    At the time, smoke was coming through the ventilation system.

398.    Mr. Betances saw other people wheezing and coughing.

399.    As a result of the fire, Mr. Betances had soot in his nose and mouth, coughed up soot after fire, experienced a burning sensation in throat and nose, coughed more than usual, coughed up sputum, could not catch breath, his voice sounded different, had increased wheezing, had worse and more frequent headaches, experienced exhaustion, felt as if food was caught in his throat which could not be cleared, felt an increased heart rate, dizziness, and anxiety, pain in his eyes, and dry mouth.

400.    Mr. Betances vomited after the fire.

401.    Soot from the fire coated the windows.

402.    After April 6, 2023, Mr. Betances made at least ten calls to the sick line to receive medical attention.

403.    As soon as he mentioned smoke inhalation, the line would hang up.

404.    Whenever he felt his throat closing up, Mr. Betances would go to the bathroom, open a window, and try to breathe.

405.    In the early morning hours of April 25, 2023, Mr. Betances was finally able to submit a sick call.

406.    The sick call was for experiencing shortness of breath.

407.    Defendant Adam Litroff, employed by Defendant Urgicare, was consulted.

408.    Dr. Litroff recommended Mr. Betances receive 2 puffs of albuterol and should remain in the clinic to be monitored.

409.    Dr. Litroff never examined Mr. Betances.

410.    Dr. Litroff, despite knowledge of the April 6, 2023, fire, did not inquire about the underlying conditions for Mr. Betances.

411.    Later during the morning of April 25, 2023, Defendant Lisa Choleff noted that Mr. Betances left the clinic to go back to his housing area to take his metered dose inhaler and did not return to the clinic.

412.    Dr. Choleff determined no further treatment was needed.

413.    After the fire, Mr. Betances was on the second floor as part of his work duties in the facility.

414.    As a result, Mr. Betances had an opportunity to view Mr. Thomas' cell after the fire.

415.    Plastic from the lights in the cell had popped and burnt.

416.    Many layers of paint had ignited and burned.

417.    The paint inside the cell and the neighboring cells were burnt.

418.    The only cleaning Mr. Betances was told to do was help remove the water that had collected on the floor of 2A.

419.    Mr. Betances was not given sufficient protection from particulate matter during this task.

420.    On April 6, 2023, Mr. Steven Chirse was incarcerated at NIC on Rikers Island.

421.    Mr. Chirse was a pretrial detainee.

422.    Mr. Chirse was assigned to housing area 6B.

423.    Prior to being in custody, Mr. Chirse was diagnosed with chronic obstructive pulmonary disease (COPD) and pneumonia.

424.     Several of the medical defendants, particularly Defendants Choleff and Patrick, were aware of Mr. Chirse's COPD and pneumonia because they had treated him prior to April 6, 2023.

425.     On April 6, 2023, Mr. Chirse was present in Housing Area 6B when smoke filled the unit.

426.     Like the other men in 6B, Mr. Chirse was forced to inhale the smoke and all the particulate and toxins it carried.

427.     As a result of the exposure to smoke, Mr. Chirse had soot in his nose, coughed up soot, experienced a burning sensation in his throat and nose, coughed more, coughed up sputum, had trouble catching his breath, experienced heavy breathing, suffered increased or more severe headaches, experienced nausea, dizziness, lightheaded, felt like his heart was beating faster, felt more anxious, suffered eye irritation, felt twitching or spasms, and had a dry mouth.

428.     Mr. Chirse asked for medical attention after the fire on April 6, 2023.

429.     These requests were ignored.

430.     On April 12, 2023, Mr. Chirse had a scheduled pulmonary function test at Bellevue Hospital.

431.     When it can time to depart for the hospital, Mr. Chirse reported that he did not want to go.

432.     Dr. Choleff noted that Mr. Chirse felt anxious, and was experiencing decreased breath sounds, feelings of chest tightness, had mild tachycardia, and elevated blood pressure.

433.     Difficulty breathing can cause severe anxiety.

434.     Despite awareness of Mr. Chirse's distress, his pre-existing condition, and the fact that Mr. Chirse was in a fire less than a week before, Dr. Choleff sent Mr. Chirse back to his

housing area to "hydrate and rest" rather than obtain emergency medical treatment or treatment for smoke exposure and inhalation.

435.    The Medical Defendants next tried to get Mr. Chirse to sign a refusal of treatment form.

436.    On April 25, 2023, Mr. Chirse requested medical attention for, among other conditions, lung pain.

437.    The next day, on April 26, 2023, Dr. Choleff documented that Mr. Chirse reported he gets dyspnea, or the feeling he is running out of air, when on a caged bus, or if he walks less than one block.

438.    Dr. Choleff's notes from April 26, 2023, state that Mr. Chirse could not go to the hospital on April 12, 2023, because he was too anxious.

439.    Dr. Choleff omitted the facts regarding Mr. Chirse's pulmonary and cardiac condition on April 12, 2023.

440.    On May 10, 2023, Dr. Choleff saw Mr. Chirse because his blood pressure was increasing despite the medication he was taking.

441.    On May 22, 2023, Mr. Chirse again saw Dr. Choleff.

442.    Dr. Choleff noted that Mr. Chirse had COPD that had been worsening over the last few months.

443.    On June 1, 2023, Mr. Chirse reported experiencing shortness of breath, but no interventions or treatment were ordered.

444.    Since being released, Mr. Chirse has had to seek emergency medical treatment for his shortness of breath and other symptoms.

445.    On April 6, 2023, Mr. Ricardo Cisneros was incarcerated at NIC on Rikers Island.

446.    Mr. Cisneros was assigned to Housing Area 6B in NIC.

447.    On April 6, 2023, Mr. Cisneros was pretrial detainee, but upon information and belief, his status changed on April 27, 2023.

448.    Mr. Cisneros was exposed to the smoke that permeated Area 6B during the fire on April 6, 2023.

449.    Like the other men in 6B, Mr. Cisneros was forced to inhale the smoke and all the particulate and toxins it carried.

450.    Mr. Cisneros experienced soot in his nose and mouth, a burning sensation in his throat and nose, increased coughing, coughing up soot, an inability to catch his breath, the feeling of an increased heartrate, wheezing, the feeling of being unable to clear his throat, pain in his eyes, and anxiety.

451.    In the five days immediately after the April 6, 2023, fire, Mr. Cisneros regularly vomited and had black mucus.

452.    On April 10, 2023, Mr. Cisneros requested medical attention for smoke inhalation because he was blowing black phlegm since the fire and coughing.

453.    On April 11, 2023, Defendant Patrick saw Mr. Cisneros.

454.    Patrick ignored Mr. Cisneros' complaints regarding black phlegm and coughing and treated Mr. Cisneros for an upset stomach due to the fire.

455.    Patrick assessed Mr. Cisneros' condition as "passive smoke inhalation."

456.    Patrick ordered Pepto Bismol tablets for Mr. Cisneros.

457.    Mr. Cisneros received no further treatment on Rikers Island before his release in mid-June 2023.

458.     On June 23, 2023, Mr. Cisneros went to be evaluated at Brooklyn Hospital because he continued to experience symptoms of smoke inhalation.

459.     On or about April 6, 2023, Mr. Floyd Harden was incarcerated at NIC on Rikers Island.

460.     Mr. Harden was assigned to Housing Area 6B at that time.

461.     Mr. Harden was previously diagnosed with asthma and used an inhaler.

462.     Beginning at approximately 1:30 p.m., Mr. Harden was injured when he was exposed to toxic smoke from a structural fire in the North Infirmary Command (NIC) within Rikers Island.

463.     Immediately after the April 6 fire, Mr. Harden reported that his inhaler no longer worked as well as it had been previously to relieve congestion and ease breathing, and that he was coughing up a significant amount of mucus.

464.     Following the fire, Mr. Harden had soot in nose and mouth, coughed up soot, coughed more than usual, coughed up sputum, had a burning sensation in his throat and nose, had trouble catching his breath, his breathing was heavier than usual, he experienced wheezing, trouble clearing his throat, had pain in his eyes, and nightmares.

465.     For several days Mr. Harden tried calling the sick call line, but the staff kept hanging up.

466.     Mr. Harden also reported a burning sensation in his mouth, particularly at night, in the days immediately following the April 6 fire.

467.     Mr. Harden lost his ability to smell following the fire.

468.     On April 13, 2023, Mr. Harden reported a sore throat, nausea, and stomach cramps via the sick call line and was scheduled for evaluation the following day, April 14.

469.    On April 14, 2023, Defendant Patrick evaluated Mr. Harden and newly diagnosed him with passive smoke exposure and dyspepsia.

470.    Symptoms of dyspepsia may include "pain or burning in the stomach, bloating, excessive belching, or nausea after eating."

471.    On April 14, 2023, Patrick also renewed Mr. Harden's Omeprazole prescription, citing his sore throat and nausea after smoke exposure.

472.    On April 19, 2023, Mr. Harrden reported coughing, stomach cramps, and a significant amount of phlegm via the sick line and was evaluated by Patrick that same day.

473.    Defendant Patrick once more diagnosed Mr. Harden with passive smoke exposure.

474.    Mr. Harden reported a "phlegm build up in [the] throat… it stays in my throat. It makes me nauseous and I cough, and I have stomach cramps."

475.    All these symptoms only began after Mr. Harden experienced smoke exposure during the April 6, 2023, fire.

476.    On or about May 15, 2023, Mr. Harden once more phoned the sick line, complaining of a productive cough, stuffiness, and an itchy throat, and was recommended for further evaluation.

477.    On May 15, 2023, Mr. Harden saw Defendant Dr. Rafaelmehr, who assessed Mr. Harden with upper respiratory disease.

478.    Mr. Harden was tested for COVID-19 and influenza, and the results were negative.

479.    On May 16, 2023, Patrick saw Mr. Harden, and diagnosed him with the common cold, based on Mr. Harden's body aches, sneezing, runny nose, head congestion, and cough.

480.    On June 5, 2023, Defendant Dr. Choleff saw Mr. Harden, who reported that none of the prior treatments for nasal congestion were effective.

481.    Dr. Choleff continued to diagnose and treat Mr. Harden for the common cold.

482.    On June 19, 2023, Mr. Harden went to Bellevue Hospital for an unrelated procedure.

483.    In the notes from the assessment and plan for that visit, the doctor noted that Mr. Harden reported a loss of smell.

484.    On October 16, 2023, Mr. Harden called the sick line because he felt his heart fluttering.

485.    Mr. Harden saw Dr. Choleff that day, who ordered an EKG, a complete blood count, and thyroid panel, but provided no other treatment.

486.    On October 17, 2023, Mr. Harden was taken to the Ear, Nose, and Throat ("ENT") clinic at Bellevue, where he was evaluated for hyposmia after smoke exposure from the April 6, 2023, fire.

487.    Hyposmia is the loss of the ability to smell.

488.    The ENT clinic identified "significant bilateral inferior turbinate hypertrophy." This condition involves swelling inside the nasal passage due to inflammation.

489.    Bellevue prescribed a course of treatment to reduce the swelling.

490.    On March 12, 2024, the ENT clinic at Bellevue Hospital diagnosed a likely injury to Mr. Harden's olfactory cells.

491.    Defendants CHS, PAGNY, Urgicare, and their employees, including the individual medical provider defendants, failed to diagnose and treat Mr. Harden's olfactory injury.

492.    Indeed, these Defendants intentionally withheld necessary treatment and examination for almost six months.

493.    As set forth above, a proper evaluation following smoke exposure is to examine the patient's airways and their respiratory and pulmonary systems.

494.    By their deliberate indifference to his needs, and intentional disregard of clear smoke exposure symptoms, these Defendants as well as all DOC defendants who denied Mr. Harden medical care, caused Mr. Harden's condition to worsen and his injuries to go untreated.

495.    On or about April 6, 2023, Mr. Emiliano Rodriguez was incarcerated at NIC on Rikers Island.

496.    On April 6, 2023, Mr. Rodriguez was assigned to Housing Area 6B in NIC.

497.    At the time of the fire, Mr. Rodriguez was sitting on his bed.

498.    His eyes started to itch, and he started to cough.

499.    Like the other men he was with in 6B on April 6, 2023, CO Mayo and other John and Jane Doe DOC officer defendants would not allow the men to leave the unit as it saturated with smoke.

500.    Before abandoning them, a correction officer gave the men blue face masks.

501.    As noted, such masks are ineffective against fire smoke.

502.    The smoke smelled like burning plastic.

503.    The smoke left residues on the walls and ceilings.

504.    After the fire no one came to clean the smoke residues.

505.    Because of the smoke exposure, Mr. Rodriguez experienced nose bleeds, difficulty breathing, and shortness of breath, in addition to other effects from breathing the poisoned air and the residues left from the fire.

506.    On April 25, 2023, Mr. Rodriguez saw Defendant Dr. Choleff because he was experiencing shortness of breath while laying down in the two weeks since he was exposed to fire.

507.     Defendant Dr. Choleff said she would Order a blood test for Mr. Rodriguez but never did.

508.     Dr. Choleff prescribed an albuterol inhaler.

509.     On or about June 27, 2023, Mr. Rodriguez called the sick line complaining of pain in the center of his chest for the previous two days and nasal congestion for approximately three months.

510.     On or about August 17, 2023, Mr. Rodriguez was diagnosed with chronic rhinitis, which "is a recurrent nasal blockage/discharge that doesn't resolve on its own."

511.     As late as on or about February 9, 2024, Mr. Rodriguez continued to suffer from chronic rhinitis induced by the April 6 fire and was using nasal sprays to alleviate the congestion.

512.     On or about April 6, 2023, Mr. Kabary Salem was incarcerated at NIC on Rikers Island.

513.     Mr. Salem was assigned to Housing Unit 6B.

514.     Beginning at approximately 1:30 p.m. Mr. Salem was injured when he was exposed to toxic smoke from a structural fire in the North Infirmary Command (NIC) within Rikers Island.

515.     Mr. Salem experienced a variety of symptoms of smoke inhalation following the April 6, 2023, fire, including soot in his nose, coughing up soot, a burning sensation in his nose and throat, an inability to catch his breath, wheezing, heavier than usual breathing, nausea, dizziness, lightheadedness, pain and burning sensations in his eyes, twitching or spasming, and loss of consciousness.

516.     Mr. Salem is a devout Muslim.

517.     The fire on April 6, 2023, fell within Ramadan.

518.    On April 25, 2023, Mr. Salem had difficulty breathing and told DOC personnel he was having a medical emergency.

519.    Mr. Salem saw Defendant Dr. Choleff that day.

520.    Dr. Choleff noted that Mr. Salem said he had streaks of blood when he blew his nose.

521.    Dr. Choleff assessed Mr. Salem as suffering from nasal congestion.

522.    Mr. Salem further reported that despite having previously played basketball without issue, he was unable to do so after the fire and its corresponding respiratory effects on him, such that he must stop playing basketball after just two minutes due to shortness of breath.

523.    On or about April 6, 2023, Mr. Darryl Williams was incarcerated at NIC on Rikers Island.

524.    Mr. Williams was assigned to Housing Area 6B in NIC.

525.    When smoke started to enter the dorm, the correction officers locked the doors and watched the inmates from the corridor.

526.    The men in the dorm tried to move away from where the smoke was heaviest.

527.    Nonetheless, the men were screaming to be let out.

528.    Many of the men were coughing, and some in the dorm passed out.

529.    The entire experience was scary, confusing, and caused him anxiety.

530.    On or about April 7, 2023, Mr. Williams reported chest pain and tachycardia, and said had to lay down on the floor when tachycardic.

531.    As a result of the fire, Mr. Williams had soot in his nose and mouth, he coughed up soot, he had a burning sensation in his nose and throat, he continued to cough more than usual, he had trouble catching his breath, and experienced dizziness and lightheadedness.

532.     Mr. Williams called the sick line to seek medical attention for these ailments, but the line was not working.

533.     After leaving DOC custody, Mr. Williams was evaluated because he was having trouble breathing.

534.     Prior to April 2023, Mr. Williams did not have these problems.

535.     On April 6, 2023, Michael Harris was incarcerated at NIC on Rikers Island.

536.     Mr. Harris was assigned to Housing Area 6N, a dorm style housing unit.

537.     At the time of the fire on April 6, 2023, Mr. Harris was attending an OSHA class.

538.     Mr. Harris began to feel an irritation in his nose and throat.

539.      He also noticed a haze in the room.

540.     Mr. Harris went into the common area of the dorm.

541.     A light alarm went off, but it made no sound. Mr. Harris and others thought that the light alarm was caused by the microwave in 6N's kitchen.

542.     Mr. Harris noticed smoke, but again thought it was caused by an issue in the kitchen.

543.     A short time later, Mr. Harris noticed fellow inmates with asthma start coughing.

544.     Mr. Harris started coughing.

545.     The John and Jane Doe Correction Officer Defendants ignored the situation.

546.     At some point a Fire Marshall arrived and began speaking to the John and Jane Doe Correction Officer Defendants. At that point they started turning down their radios so the inmates could not hear the transmissions.

547.     Following the fire, John and Jane Doe Correction Officer Defendants pretended no fire occurred.

548.    When inmates requested medical attention for respiratory issues, John and Jane Doe Correction Officer Defendants stated it was because the inmates were smoking and belittled them.

549.    As a result of the smoke inhalation, Mr. Harris experienced eye irritation, coughing, and black soot in his nasal discharge

550.    Mr. Harris also began having pulmonary issues and asthmatic symptoms.

551.    Housing Area 6N had soot and other residue from the fire on the walls, windows, and other surfaces.

552.    Defendants failed to clean these surfaces after the fire.

553.    Those housed in 6N were given brooms to sweep up surfaces.

554.    As a result, individuals in 6N attempted to clean using the brooms.

555.    This reintroduced soot and other residues into the air.

556.    At some point after April 6, 2023, Mr. Harris went to Bellevue Hospital to have his glaucoma treated.

557.    He mentioned his health issues following the fire, and he was examined.

558.    The doctor who examined him asked Mr. Harris if he uses a barbecue frequently or slept in a burnt-out building.

559.    Mr. Harris responded that he had been in jail for an extended period of time, so he had not done either.

560.    The doctor examined Mr. Harris' nose and airway and told Mr. Harris that he has particulate in his mucus membrane.

561.    On April 6, 2023, David McCall was incarcerated at NIC on Rikers Island.

562.    Mr. McCall was assigned to Housing Area 4B, a dorm style housing unit.

563.    During the fire on April 6, 2023, smoke filled the dorm.

564.    Despite the growing smoke condition, John and Jane Doe Defendant Captains and Correction Officers kept Mr. McCall and other men in 4B locked in the dorm.

565.    As the smoke became heavier, Mr. McCall went to the bathroom to wet a towel to wrap around his face.

566.    Other men were also wetting towels, so Mr. McCall had to breath in the smoke while he waited his turn.

567.    After wetting the towel, Mr. McCall went to the front of the dorm.

568.    No correction officers or captains could be seen.

569.    Mr. McCall wrapped the towel around his face, laid down on the floor to try and avoid the smoke.

570.    Despite this attempt, Mr. McCall was forced to inhale the smoke.

571.    Mr. McCall could not breathe.

572.    Mr. McCall's eyes were burning from the smoke.

573.    Mr. McCall could feel the floor underneath him heating up from the fire.

574.    As a result of the fire, Mr. McCall experienced wheezing, coughing, and burning in his throat.

575.    As a result of his exposure to the fire, Mr. McCall continues to experience breathing problems as well as other conditions.

576.    The event was traumatizing and caused Mr. McCall anxiety.

577.    At the time of the fire, Mr. McCall was a pretrial detainee.

578.    On or about March 19, 2024, Mr. McCall was acquitted of all charges that required him to be in custody at NIC on April 6, 2023.

579.    Now that he is out of custody, Mr. McCall has begun attempting to treat the long-term effects of smoke inhalation.

## FUEL TO THE FIRE: THE POLICIES, PRACTICES, DELIBERATE INDIFFERENCE, AND OTHER DEFICIENCIES THAT ALLOWS FIRES IN DOC FACILITIES

580.    In a letter to the Legal Aid Society in July 2023, Defendant Brereton was quoted by the New York City Law Department as saying, "cell fires are an unfortunate fact of life in the jails."

581.    Brereton's statement encapsulates everything that is wrong in the City's approach to "cell fires" in its jails, and only serves to highlight the City's deliberate indifference, failure to train, and policy of unconstitutional conditions of confinement.

582.    First, numerous other jail and prison facilities do not share this "unfortunate fact of life" with City jails.

583.    Jurisdictions such as the State of New York and the Westchester County Jail, even anecdotally, do not occur at the same frequency as they do in City jails.

584.    Yet the City does not question why this "unfortunate fact of life" exists, nor does it look to address the causes which have created this situation.

585.    Second, the City has been on notice for decades that to operate constitutionally compliant jails, the City must prevent fires and ensure the safety of those in their custody from fires.

586.    For example, on December 17, 1993, the Honorable Morris E. Lasker entered an order pursuant to the consent decree in the *Benjamin* cases, Docket Number 75 CV 03073 (LAP), requiring fire safety improvements.

587.    These improvements included such basic safety equipment as a functioning alarm system, operable smoke detectors or heat sensors, sprinkler systems not dependent on human intervention, and electronic egress doors.

588.    In 1998, the Honorable Harold Baer issued a subsequent order under the same consent decree requiring the City and DOC to make further fire safety improvements to City jail facilities. *Benjamin v. Kerik*, No. 75 CIV. 3073 (HB), 1998 WL 799161 (S.D.N.Y. Nov. 13, 1998).

589.    In so holding, Judge Baer noted "The absence of adequate and reliable fire protection can give rise to a Fourteenth Amendment Due Process claim. Accordingly, a 'safe' correctional facility for pretrial detainees must comport with the requisite standards of the Due Process clause of the Fourteenth Amendment." *Id.* at *5 (citations omitted).

590.    Judge Baer concluded in his order "that fire safety protections must be afforded at a level that does not expose the plaintiffs to an unreasonable risk of serious damage to their future health." *Ibid.*

591.    Thus, the City has been on notice of its obligation to protect those in DOC's custody from serious damage to their future health from fire.

592.    Third, if fires are truly an "unfortunate fact of life," the City has been deliberately indifferent to the deficiencies in its policies, practices, procedures, training, and discipline as it relates to fire safety, prevention, suppression, evacuation, and post-fire remediation.

593.    Hand in hand with the City's deliberate indifference, is that of HHC, CHS, PAGNY, and Urgicare.

594.    If fires are an "unfortunate fact of life," those providing medical services in City jails are aware of this fact.

595.    Thus, the medical defendants are aware that those in custody who they treat will be routinely exposed to smoke, that the smoke causes injuries and illness, and therefore, the patients will need to be treated for smoke-related injuries and illness.

596.    Despite this awareness, the City and Medical Defendants have no procedure in place for an emergency response to the scene of a heavy fire and smoke exposure.

597.    Similarly, the City and Medical Defendants have no procedure or protocol for providing medical services to large numbers of people in custody following smoke inhalation and exposure.

I.    The "Unfortunate Fact of Life"

598.    Since 2020, there have been hundreds of fires a year in Rikers Island facilities.

599.    According to the federal monitor in *Nunez, et al. v. City of New York, et al.*, 11 CV 5845 (LTS) (JCF), there were 328 fires systemwide in DOC.[2]

600.    In the same report, the monitor stated 1,576 fires occurred systemwide in 2021.

601.    In 2022, the monitor reported 717 fires.

602.    In 2023, the monitor reported 561 fires.

603.    More troubling, is that 351 of the 561 fires occurred between July and December 2023. In other words, more than sixty percent of the fires occurred in the second half of 2023 following DOC's mishandling of the April 6, 2023, fire, and its claim to have taken steps to remedy the problem.

604.    DOC saw fifteen fires on Rikers in one week in September 2023.

---

[2] The report is available at https://www.nyc.gov/assets/doc/downloads/Nunez/2024-04-18%20--%20Monitor's%20Report.pdf

605.    Moreover, the fires are system-wide, not just in NIC. The federal monitor reported numerous fires in all DOC facilities.

606.    Between January 2022 and July 2023, there were seventy fires at the Anna M. Kross Center (AMKC).

607.    Between January 2022 and January 2023, there were fifteen fires at the Eric M. Taylor Center (EMTC).

608.    Between January 2022 and January 2023, there were 365 fires are the George R. Vierno Center (GRVC).

609.    Between January 2022 and January 2023, there 275 at NIC/West Facility (NIC and West Facility are part of the same command).

610.    Between January 2022 and January 2023, there were fifty fires at the Otis Bantum Correctional Center (OBCC), though that facility was closed from July 2022 to June 2023.

611.    Between January 2022 and January 2023, there were 405 fires at the Robert N. Davoren Center (RNDC).

612.    Between January 2022 and January 2023, there were 78 fires at the Enhanced Supervision Housing located at the Rose M. Singer Center (RMSC).

613.    As these statistics demonstrate, fires are a frequent, pervasive, and universal problem through DOC's facilities.

614.    Moreover, DOC knows and is aware that each one of these fires has the capacity to injure and expose inmates to life threatening smoke conditions.

615.    Moreover, DOC was well aware before April 6, 2023, for persons in custody to set fires that can grow to significant magnitude within its facilities.

616.    Around 8:15 p.m. on November 5, 2021, an inmate on the second floor of NIC splashed his dinner on a correction officer, causing the correction officer to demand to be taken to the infirmary.

617.    Following this incident, the inmate started a fire using his bed linens.

618.    Another inmate threw a plastic bag into the flames.

619.    The fire grew quickly out of control, and the housing unit became clouded with smoke that was so heavy there was little to no visibility.

620.    The correction officers could not extinguish the fire, and only then called the Fire Department of New York to respond.

621.    When they couldn't extinguish the fire, two correction captains and an officer went from cell to cell, in the smoke, evacuating inmates.

622.    After the fire, five DOC employees were treated at the hospital for smoke inhalation, including two captains and three correction officers.

623.    Plaintiffs are unaware how many, if any, people in custody were treated for smoke inhalation.

624.    This incident demonstrates that DOC staff can evacuate inmates during a fire, but they choose not to.

625.    The president of the Correction Officers Benevolent Association, Benny Boscio, was widely reported as blaming the Department of Correction and its leadership.

626.    Following the incident, Boscio blamed inadequate staffing and a lack of training: "The department's failure to hire more officers has turned our jails into ticking time bombs that will explode at any minute. On top of not hiring enough staff, the department isn't even giving refresher classes in fire safety to the officers we do have."

627.     Thus, the correction officer's own union acknowledged that DOC is failing to train officers in fire safety.

628.     After the November 5, 2021, fire, then Mayor-elect Eric Adams also spoke publicly about the incident.

629.     Mayor Adams was quoted regarding the November 5, 2021, fire as stating: "If an inmate can start a fire at Rikers, then we have truly lost control . . . We need additional personnel and investments in infrastructure in addition to significantly more space and resources for mental health treatment—and we need it now."

630.     As a result of the November 5, 2021, fire, the City and its officials were on notice that they had inadequate personnel to address fire starting and fire safety, that they needed to invest in better infrastructure for fire safety, that overcrowding and a lack of mental health resources were causing fires, and that the City was not properly training its employees regarding fire safety.

631.     Despite this notice, none of these issues have been addressed.

632.     The unfortunate reality of these failures is highlighted in the continued frequency of fires in DOC facilities, the reports of monitors and others highlighting the deficiencies in the City's fire safety protocols and procedures.

633.     In addition to the November 5, 2021, fire, other incidents prior to April 6, 2023, highlight the City' deficiencies.

634.     For example, an inmate brought suit against the City for a fire in GRVC on December 22, 2019. The inmate claimed that he remained locked in his cell while it filled with smoke. Like the Plaintiffs here, the inmate experienced "excruciating chest pains, shortness of breath, blurry vision, burning eyes, burning throat, [and] pains." *See Massey v. Michele*, No. 20CV7621ATJLC, 2022 WL 1493269, at *1 (S.D.N.Y. May 11, 2022).

635.    Similarly, on June 11, 2022, there was a fire in AMKC. At least one of the inmates, who suffered from asthma, remained locked in his cell while it was filled with smoke. The inmate was never provided medical care after the fire, despite his requests. *See Spry v. City of New York*, Docket No. 23 CV 7983 (DLC) (S.D.N.Y.).

II.    *The Failure to Stop Fire Setting in DOC*

636.    In his statement on the November 5, 2021, fire, Mayor Adams (who was mayor of the City on April 6, 2023), stated that the provision of mental health services was necessary to cure the pandemic of fires in DOC facilities.

637.    As the Chief Executive of Defendant City, Mayor Adams demonstrated insight, awareness, and knowledge of this need at the highest levels of Defendant City.

638.    Defendants Molina and Maginley-Liddie were appointed by Mayor Adams.

639.    Similarly, Defendants Brereton and Lemon are responsible for overseeing fire safety in DOC facilities as was Defendant Currenti during his tenure.

640.    In addition, Defendant City relies on Defendants HHC, PAGNY, Katz, Wei, Yang, Subedi, Arias, and Rosner to help guide the provision of medical services in DOC facilities.

641.    Yet between the management of the City, DOC, HHC, and CHS, none of these defendants have attempted to address the root causes that lead to hundreds of fires each year in DOC facilities.

642.    Indeed, the DOC defendants have attempted to treat this issue punitively through removing access to batteries and attempting to create more restrictive housing.

643.    In November 2023, the DOC defendants attempted to implement the Arson Reduction Housing Unit ("ARHU").

644.    The DOC defendants opened the ARHU on November 13, 2023.

645.    ARHU was closed the next day because the housing area did not have a working fire protection system.

646.    The DOC defendants were also criticized by the federal monitor in the *Nunez* proceedings, because they implemented the ARHU secretly and without the federal monitor's oversight.

647.    Regardless of those missteps, the contemplation of ARHU simply furthered Defendants failure to address the pandemic of fires succinctly stated by Mayor Adams that better and more robust mental health services were needed for those in custody.

648.    Indeed, Defendants continue to fail to ask the central question as to why in their facilities, unlike other jails, do those in custody continue to set hundreds of fires a year?

649.    Defendants refuse to study the problem as a mental health crisis.

650.    For example, Defendants refuse to study and address the triggers that caused Marvens Thomas and others who have engaged in similar acts to set fires in the first place.

651.    Defendants also fail to implement the better and more robust mental health services called for by then Mayor-elect Adams.

652.    As a result of this failure, Defendants continue to allow hundreds of fires a year to be set by those in DOC custody, resulting in dangerous smoke conditions throughout DOC facilities.

653.    In other words, the failure to address the causes of inmate fire setting allow unconstitutional conditions of confinement to continue.

III.    *The City Fails to Comply with State and Local Fire Regulations*

654.    In addition to the constitutional requirements for which the City was on notice, the City is in violation of both its own code and New York State regulations.

655.    Under the City's own Fire Code ("FC"), DOC facilities are required to comply with various fire safety regulations. N.Y.C. Admin. Code § 29–102 (incorporating FC §§ 101 et seq.), FC §§ 401 et. seq.

656.    DOC Facilities are required to have an emergency preparedness plan "to provide the information, guidance, direction and assistance needed to protect the safety of building occupants, including, if necessary, effecting their evacuation, relocation or sheltering in place." FC § 401.3.

657.    In addition to emergency preparedness plans, DOC was and is required to conduct drills and other forms of education, with "[d]rills shall serve to familiarize building occupants as to the proper actions to take in the event of a fire or other emergency, the primary and secondary evacuation and in-building relocation routes, and fire prevention measures appropriate to the occupancy." FC § 401.7.1.

658.    In addition, the FC provides specific requirements for correctional facilities.

659.    First, the FC requires compliance with the regulations of the New York State Department of Correctional Services. FC § 409.1.

660.    The FC also contains certain staffing requirements. First, the FC requires that.

Staff trained in emergency preparedness procedures shall be in the building at all times, and within three floors or 300 feet (91440mm) horizontal distance of the access door of each resident housing area. Keys necessary for unlocking doors installed in a means of egress shall be individually identifiable by both touch and sight. When movement of occupants from one smoke compartment to another or egress from the building is impeded by staff-controlled manual releases, the staff responsible for controlling such movement or egress must be continuously available to initiate emergency procedures within 2 minutes of an alarm.

FC § 409.2.1.

661.    The FC also requires that "[t]he staff responsible for emergency preparedness procedures in [correctional facilities] shall be trained in the use of portable fire extinguishers and other manual fire extinguishing equipment."  FC § 409.2.2.

662.    The FC also requires fire protection systems to be in place. FC §§ 901 et. seq.

663.    When a fire protection system is out of service, such as a sprinkler or fire alarm system, the owner of the premises must take alternative precautions including implementing a fire watch. A fire watch requires a continuous patrol of affected areas, to put out and report fires, and be staffed with personnel with no other duties. FC §§ 901.7-901.7.2.3.

664.    In addition, when a system is out of service, the fire watch must include personnel trained to use fire extinguishers who are equipped with or have working fire extinguishers readily accessible to them. FC §§ 901.7.2.1(3)-(4).

665.    The New York State Commission of Correction ("NYSCOC") similarly regulates correctional facilities.

666.    First, the NYSCOC code states that "[i]n order to safeguard the lives and property of all occupants within each local correctional facility and to minimize the possibility of fire emergencies or other similar hazards, each facility shall practice proper fire prevention and safety measures." N.Y. Comp. Codes R. & Regs. tit. 9, § 7039.1.

667.    To ensure compliance with this mandate, the chief administrative officer of each facility is required to develop and implement written policies and procedures. N.Y. Comp. Codes R. & Regs. tit. 9, § 7039.2.

668.    Likewise, each facility must comply with all federal state and local laws, codes, rules, and regulations relating to fire safety and prevention. N.Y. Comp. Codes R. & Regs. tit. 9, § 7039.3.

669.    The chief administrative officer of each facility is further required to have the appropriate code enforcement authority to conduct annual fire and safety inspections. N.Y. Comp. Codes R. & Regs. tit. 9, § 7039.4.

670.    Similarly, the chief administrative officer of each facility is required to appoint one or more staff members to conduct regular inspections at least once a week to identify fire hazards, remove the fire hazards, and maintain a log for this purpose. Those personnel must have completed a fire protection seminar approved by the Office of Fire Prevention and Control. N.Y. Comp. Codes R. & Regs. tit. 9, § 7039.5.

671.    As is evident from the facts and circumstances set forth above, the City and the individual DOC Defendants have failed to comply with the mandate to safeguard the lives and property of those within their custody.

672.    First, the City, through DOC, has failed to develop the required emergency preparedness plans for fire, failed to update those plans to meet changing circumstances, or failed to properly train its personnel to follow those plans, or committed some combination of these three deficiencies.

673.    This problem is highlighted by both the November 5, 2021, and April 6, 2023, fires. Although both fires reached a degree beyond which correction officers could put the fires out themselves, the subsequent respondent demonstrates the lack of preparedness and training. In the November 5, 2021, correction officers and captains were able to evacuate people housed in the unit. On the other hand, during the April 6, 2023, fire, correction officers and captains left those in custody locked in while smoke saturated the environment.

674.    Second, DOC does not perform fire drills, another requirement of the City's own FC.

675.   Other jurisdictions, including the New York State Department of Corrections perform such drills. Yet the City's DOC simply ignores this requirement.

676.   With hundreds of fires occurring each year, sometimes in a single facility, with the capacity to endanger every living person within each building, the failure to orchestrate and execute fire drills at the frequency required under the law is unjustified, unreasonable, and unconstitutional.

677.   The November 5, 2021, and April 6, 2023, fires also demonstrate that the City has failed to provide sufficient staffing for fire safety.

678.   In neither fire were staff sufficiently trained in fire safety present and able to assist in the provision of fire suppression and fire safety resulting in ad hoc decisions that made the fire worse and subjected all of the occupants to smoke related injuries.

679.   During the April 6, 2023, fire, correction officers throughout the building stood by or walked out of NIC abandoning those locked in to suffer. No staff were present to assess the danger to anyone but themselves and take action to evacuate the men in the various housing units to safety.

680.   Moreover, correction officers in NIC on April 6, 2023, did not have access to individually and easily identifiable keys with which to open all doors.

681.   Security footage from April 6, 2023, shows Defendant Harrell, Tawiah, and John and Jane Doe correction officers and captain defendants struggling to identify keys to open doors to the catwalks located on the side of the NIC structure which delayed the ventilation of the fire by many minutes.

682.   Similarly, keys to open standpipe hose systems were stored on the first floor for every floor of NIC.

683.    Defendants failed to insure working fire protection systems.

684.    As noted, the sprinkler system within NIC Tier 2A was shut off after April 2022 and was not turned on until after April 6, 2023.

685.    Defendants have no explanation for how this occurred.

686.    Only after the July 2023, fire did Defendant Ramkissoon audit the Fire Security Office and the paperwork of Defendant Phillips and the employees he supervises.

687.    There, it was discovered that Phillips and the employees he supervises had not building's fire suppression and alarm systems.

688.    In any event, once this system became inoperable on April 6, 2023, Defendants were obligated to maintain a fire watch system under the regulations set forth in the City's FC.

689.    Defendants wholly failed in these obligations.

690.    This was not an isolated failure.

691.    In 2023, attorneys for the Legal Aid Society inspected fire watch logs for West facility, where Defendants opted to have a fire watch instead of an operable fire protection system.

692.    The attorneys discovered that were days long gaps in the logs, indicating that Defendants failed to maintain a legally compliant fire watch.

693.    These failures further indicate that Defendants have failed to comply with the requirements to conduct an annual inspection of their facilities as well as the weekly inspections for fire hazards.

694.    In sum, Defendants have demonstrated a systemic failure to comply with basic requirements for the provision of fire protection, planning, training, drills, education, and inspections.

695.    The New York City Fire Department ("FDNY") is the agency within Defendant City responsible for enforcing the FC in DOC facilities.

696.    Upon information and belief, FDNY has failed to issue any citations to DOC, or to force systemwide compliance with the FC.

697.    The various State and City fire code provisions have put Defendants on notice of the steps they need to take to maintain facilities free from the significant dangers posed by jailhouse fires.

698.    The failure to comply with these regulations causes unconstitutional conditions of confinement, thereby denying Plaintiffs their right to due process of law or otherwise violating their Eight Amendment Rights against cruel and unusual punishment.

699.    Forcing those in custody to ponder whether they have met their end while they are locked in a space saturated with fire smoke is amongst the most cruel and unusual punishments known in our society.

700.    Yet Defendants exhibit no care or concern for such events, brushing it off as an "unfortunate fact of life."

701.    All Defendants including City, Molina, Maginley-Liddie, Brereton, Lemon, Currenti, Miller, and the supervisory John and Jane Doe defendants, were responsible for ensuring compliance with the FC and the NYSCOC regulations but persistently failed to do so despite notice through both these regulations and prior incidents.

*IV.    Failure to Suppress Fires and Evacuate*

702.    Notwithstanding the myriad of FC and NYSCOC regulations ignored by Defendants, the failure to provide working fire protection systems, to provide working fire extinguishers and staff trained to use them, the failure to provide fire safety training and education

to both DOC personnel and people in their custody, to perform fire drills, fall far below the constitutional requirements that human beings in custody are protected from fire so they are not exposed to an unreasonable risk of serious damage to their future health.

703.    More importantly, Defendants have failed in the mandate protect individuals in their custody from the unreasonable risk of serious damage to their future health by failing to develop policies and practices for the evacuation of inmates during a fire.

704.    Defendants have also failed to train and supervise their personnel in how to evacuate individuals in their custody during a fire event, and discipline personnel who fail to follow-through on this training.

705.    There is perhaps no more fundamental means of protecting individuals from the risk of serious harm from smoke and fire than physically removing them from the zone of danger.

706.    Moreover, Defendants have failed to adequately train their personnel in identifying when people in custody must be evacuated or moved away from fire and smoke.

707.    Since at least 1998, if not earlier, Defendants were put on notice that each DOC facility must protect inmates from the unreasonable risk of serious damage to their future health. *Benjamin v. Kerik*, No. 75 Civ. 3073, 1998 WL 799161, at *5 (S.D.N.Y. Nov. 13, 1998).

708.    This rule has been repeated through many judicial pronouncements such there is no room for doubt as to Defendants obligations.

709.    Moreover, this obligation extends to HHC, PAGNY, Urgicare, and the individual defendants working under their auspices.

710.    Despite these clear mandates, Defendants continue to fail to develop and train personnel regarding necessary evacuation protocols.

711.   As set forth above, Defendants failed to evacuate persons in custody during fires that occurred both before and after April 6, 2023.

712.   In each of those fires, persons in custody were kept locked in their cell or dorm while the cells or dormitory became filled with smoke.

713.   In each of those instances, the persons in custody were forced to inhale smoke over an extended period.

714.   By forcing inmates to inhale smoke for more than the momentary duration necessary to evacuate them, Defendants unreasonably exposed these inmates to a serious risk to their future health.

715.   More importantly, the failure to evacuate these inmates did in fact cause them risk to their future health.

716.   Defendants knew these risks existed.

717.   For example, following the November 5, 2021, fire, Defendants would have been aware about smoke related injuries because the correction officers and captains involved in that incident were treated for smoke inhalation after the fact.

718.   Moreover, based on the prevalence of fires in DOC facilities, medical staff employed by Defendants HHC (including CHS), PAGNY, and Urgicare, and the named defendants employed by those entities, would know, by virtue of their training and experience the risks posed by exposure to fire and smoke.

719.   In addition, Defendants HHC (including CHS), PAGNY, and Urgicare, and the named defendants employed by those entities, receive complaints by persons in custody for smoke related injuries.

720. Thus, these defendants would also be aware of the risks and harm created by the failure to evacuate persons in DOC custody.

721. Despite Defendants' knowledge, awareness, and notice, they continue to leave human beings locked in cells or dorms filled with smoke.

722. Thus, the failure to develop policies and procedures for evacuating inmates from smoke filled areas results from Defendants' deliberate indifference.

723. The failure to train, supervise, and discipline personnel regarding evacuation of inmates from smoke filled areas also results from Defendants' deliberate indifference.

V.    *The Grievance Procedure is No Procedure at All*

724. Defendant City, through DOC, maintains a purported grievance procedure to allow persons in DOC custody to make complaints regarding their incarceration.

725. In theory, this process should have allowed persons in DOC custody the opportunity to raise concerns and complaints regarding fire safety, fire exposure, and related deficiencies in healthcare. As set forth herein, however, the grievance procedure is wholly ineffective.

726. The process itself is convoluted, dividing complaints into grievable and non-grievable complaints.

727. This distinction appears to be based on the seriousness of the complaint made in the grievance and how easily it can be resolved.

728. Grievances are handled by DOC's Office of Constituent and Grievance Services ("OCGS).

729. The DOC handbook, however, states that medical complaints can be grieved, but not complaints about medical staff. Similarly, "environmental" complaints may be grieved per the handbook.

730.    At a hearing on April 24, 2024, before the New York City Council Committee of Criminal Justice regarding DOC's grievance procedures, DOC Assistant Chief of Administration Sherrieann Rembert, testified that "non-grievable complaints typically involve one that must undergo an administrative investigative process, complaints that are related to conditions of confinement that cannot be immediately addressed by OGCS."

731.    Whether any of the issues raised in this action would be grievable or non-grievable by Plaintiffs or any other person is unknown.

732.    The grievance process itself suffers from major deficiencies.

733.    The DOC policy of forwarding grievances to DOC staff that are the subject of the grievance is dangerous as it allows staff to identify the inmates who are making complaints that could subject them to discipline.

734.    The DOC policy of forwarding grievances to DOC staff is dangerous as it allows staff to forward the request to other staff about whom grievances are made.

735.    Thus, Defendant City has a policy and/or custom of allowing the employees and contractors who are the subject of grievances to be made privy to inmate's grievance communications.

736.    This policy puts inmates in DOC custody at risk of retaliation from officers, contractors, and supervisors, who may be reprimanded and/or investigated due to inmate grievances.

737.    Moreover, grievances regarding healthcare are sent to HHC which appears to regularly ignore the duties to investigate and resolve grievances.

738.    On January 12, 2012, the United States Department of Justice [hereinafter as 'DOJ'] notified the CITY OF NEW YORK of its intent to intent to conduct an investigation of the

treatment of those incarcerated at Rikers Island pursuant to the Civil Rights of Institutionalized

Persons Act ("CRIPA"), 42 U.S.C. § 1997, and Section 14141 of the Violent Crime Control and

Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141").

739.    On or about August 4, 2014, the DOJ served THE CITY OF NEW YORK with its

public report of the findings from its investigation [hereinafter as '2014 DOJ Report'].

740.    Moreover, the *Nunez* Monitor has noted that Defendants' persistent failure to

address reasonable grievances like access to medical treatment and privileges often leads to

unnecessary uses of force.

741.    The 2014 DOJ Report found the DOC's grievance system involved dangerous

delays and failed to adequately respond to emergency grievances including grievances regarding

staff misconduct that endangers inmates.

742.    Moreover, the 2014 DOJ Report noted that the backlog of prosecutions of staff

allowed officers who had committed egregious misconduct to remain on staff.

743.    At the April 24, 2014, City Council Committee Hearing, Criminal Justice

Committee Chair Sandy Nurse noted that an analysis showed that for all grievances filed in the

previous four years, only fifteen percent of grievances received a resolution.

744.    Moreover, DOC's internal record keeping and tracking with regard to grievances is

also convoluted, contradictory, and incomprehensible, which further causes grievances to be lost

and unresolved.

745.    As a result of the many deficiencies identified in DOC's grievance procedure,

Defendants have effectively foreclosed the ability of persons in DOC custody to pursue corrective

action for deficiencies in fire safety, fire prevention and protection, and the denial of medical care.

746.    Indeed, the grievance procedure operates as the proverbial dead end, allowing Defendants to continue with business as usual, disregarding constitutional rights, endangering the lives of persons in their custody, and subjecting them to inhumane and unconscionable conditions.

747.    The failures of the grievance procedure give inmates little recourse to address failures of DOC and HHC and as such, inmates often resort to causing disturbances or even violence to have their basic needs met.

748.    As the foregoing makes clear, Defendants' intentional conduct, deliberate indifference, and negligence resulted in policies and practices that violate the constitution both before and during a fire.

749.    After a fire, however, Defendants are likewise deliberately indifferent to the need clean and remediate areas affected by fire smoke, and Defendants fail to train, supervise, and discipline their personnel for failure in cleaning and remediating areas affected by fire and smoke.

750.    Plaintiffs universally experienced after every fire a complete disregard of the need to properly clean every surface.

751.    Fire smoke leaves soot and other residues on every surface in a room: floors, walls, ceilings, and furniture.

752.    The American Red Cross publishes a guide to cleaning up after a fire.

753.    To remove soot and smoke from these surfaces, the American Red Cross recommends using soap or detergent, or a mix of various cleaners.

754.    In fact, the American Red Cross only recommends using liquids to clean smoke and soot from surfaces.

755.    Moreover, the American Red Cross recommends wearing gloves and other protective clothing for cleaning up after a fire, including N95 masks.

756.    Other guidelines recommend that soft surfaces and fabrics should be laundered.

757.    Air filters in climate control systems should be checked and replaced.

758.    Defendants did not follow any of these guidelines.

759.    Instead, Defendants either made no efforts to clean surfaces affected by soot and smoke, or forced inmates to clean without the necessary supplies, equipment, and personal protective gear.

760.    Defendants also failed to clean the air and ventilation system in NIC and other facilities following a fire.

761.    Defendants also failed to test the air quality in DOC facilities after the fire.

762.    These failures to remediate a facility after it is affected by fire and smoke further subject persons in Defendants' custody to an unreasonable risk of serious harm to their health.

763.    A study by researchers at the Massachusetts Institute of Technology found that 20,000 premature deaths were caused by particulate exposure resulting from human-ignited fires that degrade air quality.

764.    By forcing inmates to clean the housing areas themselves with brooms and without the proper cleaning supplies, and failing to test the air quality, caused the inmates' risk of particle exposure, and thus serious illness and death, to increase.

765.    Thus, Defendants failure to provide for a safe and effective remediation of NIC and other facilities compounded the unconstitutional conditions of confinement created and permitted by Defendants.

*VI.    The Myth of Understaffing*

766.    Whenever DOC's practices are challenged, inevitably Defendants argue that but for staffing shortages they would be complying with the constitution.

767.    This contention, however, is a myth conveniently paraded by Defendants whenever it suits them.

768.    Indeed, both Mayor Adams and the president of the correction officer's union invoked staffing shortages as an explanation for both the November 5, 2021, fire, and the more than a thousand fires set that year.

769.    The problem is not staffing shortages, but Defendants City, Molina, Maginley-Liddie, Brereton, Lemon, Currenti, Miller, and the policymakers among the John and Jane Doe Defendants' mismanagement on a systemic level.

770.    In their December 6, 2021, report, the *Nunez* Monitor Team opined that "[t]he most extreme illustration of the Department's inability to properly manage its Staff is that on any given day in October 2021, an average of approximately 80 posts went unmanned—including posts in which Staff directly supervise and facilitate services for people in custody."

771.    The *Nunez* Monitor's Eleventh Report highlighted "the paradox between the exceptionally large number of uniformed staff employed by DOC and the Department's pervasive belief that it is 'understaffed.'" The Monitoring Team found that the real problem is the reckless and careless manner in which staff is deployed, not the number of staff available.

772.    The *Nunez* Monitoring Team identified multiple, longstanding, and obvious deficiencies in the way that Defendant City staffs the DOC that have led to dysfunction, danger, and death stating that "[t]he level of dysfunction within the Department's staffing framework is unmatched by any jurisdiction with which the Monitoring Team has had experience."

773.    The Monitor further opined that "the Department's most critical resource—its staff—is so poorly administered that even the most basic aspects of workforce management have

been neglected and/or circumvented for decades. This mismanagement has directly caused a sea of inadequacies and impediments to reform." (emphasis in original).

774.    "Both the over-deployment (e.g., too many staff responding to an alarm) and under-deployment (e.g., unmanned posts or insufficient numbers of staff to support proactive supervision) have been consistent contributing factors to the unnecessary and excessive use of force and violence (e.g., inmate on inmate fights and stabbings and slashings) on the housing units."

775.    The Monitoring Team opined that there is a direct link between these staffing failures and the ubiquitous force and violence in housing units, finding that "delayed access to medical treatment, delayed or canceled access to programming and recreation, and delayed access to commissary are frequently found by the Department to have caused tension that ultimately leads to uses of force and violence on the housing units."

776.    The *Nunez* Monitoring Team concluded that the DOC "does not have the ability to accurately and easily identify what facility a staff member is assigned to, what tour and/or post they may work or what their status is (e.g., active duty, sick, MMR, etc.)."

777.    Further, the Monitoring Team found that DOC engaged in a pattern and practice of understaffing housing units by "tolerating a culture that allows staff to circumvent assignments to housing units."

778.    Even supervisors assigned to housing units perform only "perfunctory tours while on site. For example, immediately after a Supervisor completed their tour, the Monitoring Team visited the same housing unit only to find multiple unsecured doors and covered cell windows."

779.    DOC "allows non-essential post assignments to be filled prior to filling posts required to meet core Department responsibilities. This is simply unheard of in a correctional

setting. A post assignment classification system and critical post list are central to the safe operation of any facility and the lack of such a structure creates a disorganized and unregulated staffing pattern that can easily lead to imminent danger."

780.    Facilities do not reconcile their daily rosters to ensure that all staff who are present are assigned to a post. For instance, a staff member may be marked as present, removed from the roster for their assigned post, but not re-assigned to another post."

781.    "Among the Department's 7,900 uniform staff, almost 30% are not available to work with the incarcerated population and many of them likely do not have any other responsibilities.

782.    "Department and OATH caseloads are already overwhelmed with a significant number of cases. As a result, [sick leave] abuses, like use of force miscount, appear to continue with little accountability in a timely manner."

783.    DOC allows staff to place bids for specific posts which is unheard of in the correctional community because it leads to experienced staff being assigned posts where they do not supervise housing units.

784.    Like some other uniformed agencies like the New York City Police Department ("NYPD"), the DOC has unlimited sick leave.

785.    It is axiomatic that if staff have access to unlimited sick leave, some of them may seek to abuse that benefit.

786.    This is why other departments, like the NYPD have policies that require 1) verification of actual illness and 2) ensure that sick leave is not abused.

787.    Despite decades of abuse of the sick leave system by some employees, DOC failed to develop any policy to ensure that sick leave was not abused.

788.    Beginning in April of 2021, larger numbers of DOC staff than usual began calling out sick or failing to appear at all.

789.    Defendant City was explicitly told to "develop, in consultation with the Monitor, an interim Security Plan that describes, in detail, how various security breaches will be addressed by October 4, 2021."

790.    The *Nunez* Monitor's March 16, 2022, report, continued to note that DOC's "staffing conventions—including scheduling, tour and post assignments, and general deployment—are far outside the generally accepted practice in correctional facilities."

791.    In that same report, the *Nunez* Monitor Team stated, "The Department's staffing issues are perplexing and are driven by deeply ingrained patterns of mismanagement and dysfunction. In relation to the size of the incarcerated population it manages, the Department has more staff resources than any other correctional system with which the Monitoring Team has had experience."

792.    As of April 18, 2024, Defendant City was still deficient on aspects of the *Nunez* Action Plan related to staffing.

VII.    *Denial of Medical Care: Deliberate Indifference and Deliberate Deception*

793.    Defendant HHC, through CHS, is responsible for providing medical care to inmates in custody in DOC custody.

794.    Defendants Katz and Wei are responsible for ensuring the quality of care meets relevant standards.

795.    In addition, they are subject to the constitutional requirements at issue in this action.

796.    Defendants Yang, Subedi, Arias, Castellanos, and Rosner, in their respective roles as executive management in CHS, are responsible for maintaining the constitutionally required standard of care to persons in DOC custody.

797.    This includes developing policies, procedures, and protocols to ensure that persons in DOC custody receive the required care.

798.    As noted, hundreds of fires each year occur in DOC custody.

799.    Thus, Defendants HHC, Katz, Wei, Yang, Subedi, Arias, Castellanos, and Rosner, are aware of the potential that individuals they are required to treat will suffer exposure to smoke and fire.

800.    Defendants HHC, Katz, Wei, Yang, Subedi, Arias, Castellanos, and Rosner are also aware of this fact based on specific fires, including the November 5, 2021, fire.

801.    Defendants HHC, Katz, Wei, Yang, Subedi, Arias, Castellanos, and Rosner contract with two other defendants for the provision of medical care in DOC facilities.

802.    First, Defendant PAGNY provides the staffing of doctors and nurses in all CHS clinics and offices.

803.    Second, Defendant Urgicare administers and staffs the Urgicare Center.

804.    Defendants PAGNY and Urgicare provide CHS with the staff for the clinic in NIC and its other facilities.

805.    The staff of the clinic in NIC includes the individually named doctor, physician assistant, and nurse defendants, including Defendants Choleff, Ray, Patrick, Kelly, Rafaelmehr, Schwaner, Sikder, Ndayishimiye, Shpits, Chukwneke, and Mejia.

806.    Defendants Flores, Wachtel and Litroff the Urgicare center, although Flores and Wachtel are also officers and executives of Urgicare.

807.    As set forth herein, Defendants Choleff, Ray, Patrick, Kelly, Rafaelmehr, Schwaner, Sikder, Ndayishimiye, Shpits, Chukwneke, Mejia, and Litroff all disregarded signs of smoke inhalation injuries, signs of respiratory or pulmonary conditions, and misdiagnosed conditions despite clear correlation between the Plaintiffs' symptoms and the fact they had been in a fire.

808.    On the days of both the April 6, 2023, and the July 17, 2023, fires, none of the individual plaintiffs were assessed for injuries or trauma related to smoke exposure.

809.    Indeed, to the extent they were present at the time of the fire on April 6, 2023, Defendants Choleff, Ray, Patrick, Kelly, Rafaelmehr, Schwaner, Sikder, Ndayishimiye, Shpits, Chukwneke, and Mejia left NIC and Rikers instead of treating Plaintiffs and the other men in NIC that day.

810.    Moreover, as the first line in treating Plaintiffs, Defendants Choleff, Ray, Patrick, Kelly, Rafaelmehr, Schwaner, Sikder, Ndayishimiye, Shpits, Chukwneke, Mejia, and Litroff should have either evaluated Plaintiffs and other men housed in NIC for smoke inhalation injuries or sent them to another provider to be evaluated.

811.    Further, in the days that followed, almost none of the individual plaintiffs received medical care.

812.    The sick call line, also a part of HHC and CHS, hung up on everyone referencing smoke and the fire.

813.    For those Plaintiffs who did receive attention, they were either knowingly or recklessly misdiagnosed with other conditions.

814.    For example, when Mr. Bellere reported coughing the day after the fire, he was given cough medicine or a decongestant.

815.    On the second day after the fire, Mr. Bellere reported a sore throat. Defendants treated him for COVID-19.

816.    Both coughing and a sore throat are symptoms of smoke inhalation.

817.    It should have been obvious to any competent healthcare professional that Mr. Bellere was suffering from smoke inhalation, including a full evaluation for smoke-related injuries.

818.    Nonetheless, the individual medical provider ignored the obvious.

819.    The decision to ignore the possibility of smoke exposure was either the product of an intentional or knowing choice, or the individual provider was so incompetent that they were reckless and/or negligent in their provision of care.

820.    In either scenario, Defendants wrongfully denied Mr. Bellere medical care.

821.    Mr. Bellere was not alone. Every named Plaintiff experienced a denial of medical care, as did numerous other men housed in NIC on April 6, 2023.

822.    These failures continued after April 6, 2023, and include the deficient medical responses to the fires in May and July 2023 in NIC.

823.    After a fire, a person may have smoke residue, soot, and other particulate in their airways, respiratory system, and pulmonary systems, and these parts of the body may themselves be injured from the exposure to smoke and fire.

824.    In addition, someone who suffers smoke exposure may experience elevated levels of dangerous chemicals in their blood, such as cyanide.

825.    Thus, smoke exposure victims should receive at the very least visual inspections of their airways, complete tests for blood count, serum electrolytes, creatinine, arterial blood gases, electrocardiogram, toxicology screens, and a chest X-ray.

826.    In addition, a chest CT may reveal other particulates lodged in the pulmonary system.

827.    As discussed herein, neither the individual plaintiffs, nor the Class members, received these tests following the fires.

828.    In the immediate aftermath of a fire, healthcare professionals must take various measures to assess its impact on health and to implement appropriate short-term and long-term remedies.

a)  Initial Assessment and Triage

829.    First, safety is the priority; first responders must ensure the scene is safe for both rescuers and victims.

830.    Defendants wholly ignored this requirement, as Plaintiffs and the Class members remained locked in cells and dorms saturated with smoke, with no remediation of the facility in the fire's aftermath.

831.    Second, healthcare professionals must conduct a primary survey focusing on airway, breathing, and circulation.

832.    The first component of the primary survey includes a check for airway patency, to measure adequate airflow; looking for signs of airway compromise such as soot around the mouth or nose; singed nasal hair; or carbonaceous sputum, a typical sign of smoke inhalation.

833.    The primary survey of airway, breathing, and circulation was never performed, missing crucial signs of airway compromise such as soot around the mouth or nose, singed nasal hair, and carbonaceous sputum.

834.    Indeed, the medical personnel employed at NIC by the City, DOC, HHC, and PAGNY on April 6, 2023, exited the building during the fire and left Rikers Island.

835.   The second component of the primary survey includes assessing respiratory rate, effort, and oxygen saturation, and looking for signs of respiratory distress or failure.

836.   Again, respiratory rate, effort, and oxygen saturation were not properly assessed, which can lead to unnoticed respiratory distress and failure.

837.   The third component of the primary survey includes checking the pulse rate, blood pressure, and capillary refill--which assesses blood flow--and looking for signs of shock.

838.   Pulse rate, blood pressure, and capillary refill were not checked, which can lead to undiagnosed and untreated shock.

839.   As set forth above, numerous Plaintiffs suffered various effects of smoke exposure that would have been identified in the primary survey.

840.   The failure to perform the primary survey resulted in Plaintiffs' suffering various medical conditions untreated for weeks, months, and years following exposure.

841.   Moreover, the failure to provide the primary survey caused various conditions to worsen or increase in severity over time.

b) Immediate Interventions

842.   Third, for airway management, healthcare professionals must consider early intubation, especially if there is evidence of inhalation injury or facial burns.

843.   Because Plaintiffs' medical needs were either entirely ignored or knowingly mistreated by Defendants in the aftermath of the April 6, 2023, and July 17, 2023, fires, airway management was neglected despite clear evidence that numerous Plaintiffs may have an inhalation injury which can result in severe airway edema (when fluid builds up in the body's tissues and organs) and compromised breathing.

844.   Fourth, healthcare professionals should use fiberoptic bronchoscope-guided intubation before significant airway edema develops.

845.   Simply put, Defendants failed to provide any opportunity for Plaintiffs to be evaluated for these risks.

846.   Fifth, for breathing, administer 100% oxygen via a non-rebreather mask or bag-valve-mask if the patient is not intubated, and monitor arterial blood gases and carboxyhemoglobin levels to measure the amount of carbon monoxide in the blood.

847.   Despite all Plaintiffs experiencing trouble breathing, and the significant risk of carbon monoxide poisoning, no Plaintiff was evaluated to determine whether oxygen should be administered.

848.   Plaintiff's arterial blood gases and carboxyhemoglobin levels were neither measure not monitored, missing critical indicators of respiratory compromise and carbon monoxide exposure.

849.   Sixth, hyperbaric oxygen therapy, which uses pure oxygen and increased air pressure to help the body heal, should be considered for severe carbon monoxide poisoning.

850.   Hyperbaric oxygen therapy was not considered for severe carbon monoxide poisoning, potentially leading to prolonged hypoxia and long-term neurological damage.

851.   In most instances, Plaintiffs either failed to receive any immediate medical attention either on the day of a particular fire or in the days after, or their fire related injuries were treated as another condition such as the common cold, allergies, and upset stomachs.

852.   Because of these failures, Plaintiffs were never evaluated for the risks and health problems described here in.

853.    Worse still, for Plaintiff's with pre-existing conditions that may have been aggravated by smoke exposure, Defendants provided no evaluation or treatment for those conditions.

c) Detailed Assessment of Situation and Stabilization of Victims

854.    Healthcare professionals must also obtain a detailed history of the event, including duration and intensity of smoke exposure, and perform a thorough physical examination noting burns, inhalation injury signs, and neurological status.

855.    A detailed history of the event, including duration and intensity of smoke exposure, was never obtained.

856.    A thorough physical examination for thermal injuries, and neurological status was not performed, leading to undiagnosed and untreated injuries.

857.    Healthcare professionals must also obtain laboratory and imaging studies, including a complete blood count, serum electrolytes, creatinine, arterial blood gases, and carboxyhemoglobin levels.

858.    They must also perform a chest X-ray and consider a chest CT scan to evaluate lung injury.

859.    Defendants never performed essential laboratory and imaging studies, including complete blood count, serum electrolytes, creatinine, arterial blood gases, and carboxyhemoglobin levels, were not obtained, which further contributed to Plaintiffs' smoke related health problems either continuing or worsening.

860.    Chest X-rays and chest CT scans to evaluate lung injury were not performed, missing potential life-threatening conditions such as pulmonary edema and lung collapse.

861.    As noted, healthcare professionals should use fiberoptic bronchoscopy to assess the extent of inhalation injury, remove soot/carbonaceous material, and guide endotracheal intubation if needed.

862.    Examinations using fiberoptic bronchoscopy to assess the extent of inhalation injury, remove soot/carbonaceous material, and guide endotracheal intubation were never performed resulting in continuing and/or worsening smoke related injuries and illnesses.

d) Management of Specific Toxins

863.    Post smoke exposure treatment requires management of dangerous chemicals introduced into the body through inhaling smoke, such as carbon monoxide (COHb) and cyanide.

864.     For carbon monoxide poisoning, a patient needs 100% oxygen administered immediately, and in severe cases (COHb levels above 25% or neurological symptoms) hyperbaric oxygen therapy. The patient also needs to be monitored for cardiac and neurological side effects from carbon monoxide sequelae.

865.    For cyanide poisoning, a patient is supposed to receive hydroxocobalamin (Cyanokit) as the first-line antidote and supportive care including 100% oxygen and cardiovascular support.

866.    Plaintiffs were never tested for carbon monoxide or cyanide poisoning,

    b)  Supportive Care and Monitoring

867.    If required, healthcare professionals are supposed to perform bronchial hygiene measures including chest physiotherapy, therapeutic coughing, deep breathing exercises, and early ambulation, or administer medicines such as beta-2 agonists, racemic epinephrine, N-acetylcysteine, and aerosolized heparin, which can aid breathing and improve lung function.

868.    As noted above, Plaintiffs all experienced various conditions affecting their throats, airways, and lungs, as well as issues involving breathing, hyperventilation, and coughing.

869.    In addition, patients need to be monitored for other problems including infection and fluid overload which may result from smoke related injuries.

870.    Due to Defendants failures following the fires, none of these interventions were provided when needed.

e) Long-Term Care and Rehabilitation

871.    Healthcare professionals also need to monitor for long-term respiratory complications such as chronic obstructive pulmonary disease or bronchiolitis obliterans, and provide pulmonary rehabilitation as needed.

872.    They need to ensure adequate nutritional intake to support healing and recovery.

873.    Finally, healthcare professionals need to address psychological trauma and provide mental health support.

874.    Defendants provided none of these services, and indeed, have no plans to provide long term care for the injuries they caused by their wrongdoing before, during, and after the fire.

875.    The foregoing interventions and treatments are not the product of mere conjecture; they are standards of care set forth in medical journals.

876.    Moreover, any competent healthcare professional would be aware that following a fire these medical interventions and treatments must be performed on the victims of smoke exposure.

877.    Plaintiffs and the putative classes will also require regular medical surveillance to assess whether they have developed any of the conditions or malignancies associated with their exposures.

878.    If any of the Plaintiffs had been stuck in a burning house or building, indeed, any other structure than a DOC facility, they would have received immediate medical attention after being evacuated from the premises.

879.    The failure to provide the treatments and interventions detailed above was not due to accident or mistake.

880.    At every level these failures result from intentional, knowing, reckless and otherwise voluntary omissions.

881.    Defendants HHC, CHS, PAGNY, and Urgicare and the individual healthcare providers sued herein intentionally, knowingly, recklessly withheld proper treatment from Plaintiffs.

882.    In particular, knowing the standard of care fire and smoke exposure victims are required to receive, Defendants HHC, CHS, PAGNY, and Urgicare chose not to implement a method of providing such victims emergency medical services.

883.    Defendant Urgicare, which Defendants Flores and Wachtel hold out to be the consultant for emergency medical services and to function as the emergency room for Rikers Island, failed to provide any such consulting or services to Plaintiffs following any of the fires in which they suffered smoke exposure.

884.    Further, the sick line through which Plaintiffs request medical attention would hang up when Plaintiffs and others in NIC referenced smoke related injuries.

885.    A number of Plaintiffs reported or exhibited clear signs of smoke exposure health problems to the individual medical providers, yet they deliberately diagnosed Plaintiffs' conditions and reported them as such in Plaintiffs' medical records.

886. The notion that competent medical personnel could fail to draw the connection between conditions like a cough or sore throat and a fire a day or two before is absurd.

887. If they are not competent medical personnel, Defendants placed these incompetents in a position to harm and injure Plaintiffs through their incompetence.

888. The degree to which Defendants Choleff, Ray, Patrick, Kelly, Rafaelmehr, Schwaner, Sikder, Ndayishimiye, Shpits, Chukwneke, Mejia, and Litroff attempted to avoid treating Plaintiffs for smoke inhalation injuries is so extreme that it leads to the inescapable conclusion that they deliberately sought to avoid connecting Plaintiffs' symptoms with smoke inhalation.

889. This is further evidenced by the fact that on the occasions when Plaintiffs could speak to a healthcare professional outside of CHS, Plaintiffs got proper medical attention.

890. Thus, Defendants Choleff, Ray, Patrick, Kelly, Rafaelmehr, Schwaner, Sikder, Ndayishimiye, Shpits, Chukwneke, Mejia, and Litroff denied Plaintiffs medical care in violation of Plaintiffs' constitutional rights.

891. This denial of medical care caused Plaintiffs' conditions to go untreated, either lengthening or worsening their symptoms and causing new illnesses.

892. Moreover, Choleff, Ray, Patrick, Kelly, Rafaelmehr, Schwaner, Sikder, Ndayishimiye, Shpits, Chukwneke, Mejia, and Litroff were deliberately indifferent to the medical needs of Plaintiffs.

893. Defendants HHC, Katz, Wei, Yang, Subedi, Arias, Castellanos, Rosner, PAGNY, Chew, Becker, Urgicare, Flores, and Wachtel, were also deliberately indifferent to the medical needs of Plaintiffs and the putative classes.

894.    Knowing frequency and severity of fires in DOC facilities, these Defendants disregarded substantial risks posed by smoke exposure.

895.    The evacuation policy for CHS was written by Defendant Castellanos.

896.    Defendant Castellanos does not have a medical degree or any emergency services experience.

897.    Defendant Castellanos has a master's degree in business administration.

898.    The entire policy written by Castellanos is barely two pages and applies to all CHS facilities even those facilities outside of Rikers Island.

899.    The policy offers no specific information regarding evacuation procedures.

900.    The policy does not address or instruct the medical staff regarding their duties to treat injured inmates in the event of an emergency.

901.    The policy instructs staff to evacuate or move away from a smoke or fire condition but not to assist inmates in doing so unless they are unable to walk and only then if DOC requests assistance in doing so.

902.    The Policy written by Defendant Castellanos instructs staff to neglect their medical obligations and to violate inmates' Constitutional rights and is therefore unconstitutional.

903.    The policy does not provide for the establishment of a triage unit outside of the building where inmates can be triaged after being evaluated.

904.    It is this policy that likely led to most, if not all, CHS medical staff fleeing the area for hours after the incident without regard for the fact that the inmates trapped inside required immediate medical and mental health treatment after the incident.

905.    These Defendants also failed to train, supervise, and discipline medical providers in their employ in the proper treatment of victims of smoke inhalation.

906.    Further, in the administration and/or participation in the CHS system, these defendants failed to develop practices and procedures, as well as provide the equipment and supplies, which would allow individual healthcare professionals the ability to treat individuals in DOC custody for smoke inhalation including in a field setting.

907.    These Defendants also failed to implement practices and procedures that would allow an emergency medical response to widespread smoke inhalation due to a large fire.

908.    These Defendants also promulgated policies and procedures and permitted practices and customs that allowed healthcare providers in their employ or under their supervision to routinely submit incomplete and inaccurate medical records.

909.    Specifically, the Defendants permitted, acquiesced, ratified and were otherwise deliberately indifferent to a practice by individual healthcare providers of creating incomplete or inaccurate notes regarding a patient's complaints and history and a practice of permitting individual healthcare providers to create and submit incomplete and inaccurate descriptions of their evaluation and examination of patients.

910.    This practice and custom of creating incomplete and inaccurate medical records, coupled with routine intentional or reckless misdiagnosing of conditions after smoke and fire exposure, had the effect of limiting documentation that would reveal the true scope of the health crisis posed by exposure to smoke and fire throughout DOC.

911.    In turn, by allowing these policies, practices, procedures, and customs to continue, Defendants HHC, Katz, Wei, Yang, Subedi, Arias, Castellanos, Rosner, PAGNY, Chew, Becker, Urgicare, Flores, and Wachtel, aided and abetted Defendants City and DOC to downplay and obscure the effects of their deliberate indifference and other failures related to smoke and fire exposure in DOC facilities.

912.    As stated above, these Defendants were also deliberately indifferent to the mental health crisis underlying the hundreds (and sometimes thousands) of fires set in DOC facilities.

913.    In sum, Defendants HHC, Katz, Wei, Yang, Subedi, Arias, Castellanos, Rosner, PAGNY, Chew, Becker, Urgicare, Flores, Wachtel, Choleff, Ray, Patrick, Kelly, Rafaelmehr, Schwaner, Sikder, Ndayishimiye, Shpits, Chukwneke, Mejia, and Litroff were deliberately indifferent to a physical and mental health crisis in DOC facilities.

VIII.    *Summary: Monell Liability of Defendants City, HHC, and Certain Named Individuals*

914.    Lest there be any doubt, Defendant City, as well as Defendants Molina, Maginley-Liddie, Brereton, Lemon, Currenti, Miller, and the policymakers among the John and Jane Doe Defendants, were and/or remain policymakers for their respective agencies and entities, are liable for the following policies, practices, customs, and deficiencies:

a.   Deliberate indifference to unconstitutional conditions of confinement concerning:

1.   Fire setting;

2.   Fire safety and prevention;

3.   Security, housing, classificattion, and movement of inmates;

4.   Evacuation from smoke and fire;

5.   Emergency medical and mental health services;

6.   Remediation and cleaning of areas and infrastructure affected by smoke and fire.

b.   Denial of medical and mental health treatment

c.   Failure to train, supervise, discipline personnel regarding:

1.   Fire safety and prevention;

2. Evacuation from smoke and fire;

3. Emergency medical services;

4. Remediation and cleaning of areas and infrastructure affected by smoke and fire.

915.    Further, Defendant HHC, as well as Katz, Wei, Yang, Subedi, Arias, Castellanos, Rosner, Wachtel, and Flores, as policymakers for their respective agencies and entities, are liable for the following policies, practices, customs, and deficiencies:

a. Deliberate indifference to medical need concerning:

1. Fire setting;

2. Emergency medical and mental health services;

3. Treatment of smoke inhalation injuries, symptoms and conditions; and

4. Remediation and cleaning of areas and infrastructure affected by smoke and fire.

b. Denial of medical and mental health treatment

c. Failure to train, supervise, discipline personnel regarding:

1. Emergency medical and mental health services; and

2. Treatment of smoke inhalation injuries, symptoms and conditions.

916.    These policies, practices, customs, and deficiencies predate the April 6, 2023, fire, and remain ongoing until the present.

## **CLASS ALLEGATIONS**

917.    With respect to their claims for damages and injunctive relief, Plaintiffs bring this action on their own behalf and, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(l), 23(b)(2), and 23(b)(3).

918.   Plaintiffs bring this action on behalf of a class under Federal Rules of Civil Procedure 23(a), 23(b)(l), and 23(b)(3) defined as:

> All persons detained and in the custody of the New York City Department of Correction, who were housed and present in North Infirmary Command on April 6, 2023, from the moment the fire started that day through 12:01 a.m. on April 7, 2023.

919.   The class is so numerous that joinder of all members is impracticable. Upon information and belief, hundreds of people were housed and present in NIC on April 6, 2023.

920.   There are common questions of law or fact, and the claims or defenses of the representative parties are typical of the claims or defenses of the class.

921.   The representative parties will fairly and adequately protect the interests of the class.

922.   Plaintiffs also bring this action on behalf of a class under Federal Rules of Civil Procedure 23(a), 23(b)(l), and 23(b)(3) defined as:

> For the maximum period allowable by law, all persons detained and in the custody of the New York Department of Correction, who were exposed to smoke resulting from human-ignited fires.

923.   The class is so numerous that joinder of all members is impracticable. Upon information and belief, during the past three years, thousands of incarcerated people in DOC custody were exposed to smoke from human-ignited fires.

924.   There are common questions of law or fact, and the claims or defenses of the representative parties are typical of the claims or defenses of the class.

925.   The representative parties will fairly and adequately protect the interests of the class.

926.   Plaintiffs also bring this action on behalf of an injunctive class under Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) defined as:

For the maximum period allowable by law, all individuals all persons detained and in the custody of the New York Department of Correction, who were or may be exposed to smoke resulting from human-ignited fires.

927.    The same acts, omissions, policies, practices, customs by Defendants City, HHC, PAGNY, and Urgicare apply generally to this class, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

928.    Most of the putative class members in each of the three classes are in custody and/or economically disadvantaged, making individual lawsuits impracticable.

929.    Judicial economy weighs in favor of avoiding multiple actions challenging the same policy and practice, particularly where individual suits could lead to potentially inconsistent results.

930.    The class members are identifiable using records maintained by Defendants City and HHC in the ordinary course of business.

931.    Common questions of law and fact exist for all class members in each of the three classes herein and predominate over any questions solely affecting individual members thereof.

932.    Among the questions of law and fact common to members of the class are:

a.    whether Defendants' failure to develop policies or practices that would decrease or eliminate the number of fires in DOC facilities constituted a failure to protect class members from a serious risk to their future health, thus violating their due process;

b.    whether Defendants' policies, practices, and customs relating to fire safety, prevention, and emergency planning created unconstitutional conditions of confinement;

c.  whether Defendants were deliberately indifferent to a substantial risk of harm in developing policies and practices relating to evacuating inmates in the event of fire and smoke;

d.  whether Defendants were deliberately indifferent to the medical needs of inmates after they were exposed to fire and smoke;

e.  whether Defendants were deliberately indifferent to medical needs by failing to develop formal policies and procedures for treating persons in custody following exposure to smoke where they may have inhaled smoke;

f.  whether Defendants must provide for emergency medical services following smoke exposure and inhalation; and

g.  whether Defendants must provide for long term medical care for class members who were exposed to smoke and may later develop respiratory, pulmonary, or other conditions.

933.  Defendants are expected to raise common defenses to the claims of all class members in each of the three classes herein, including denying that its policy and practice violated the Constitution.

934.  Plaintiffs' claims are typical of those of all putative class members herein.  For the first class related to April 6, 2023, Plaintiffs' claims arise from the same events, acts, and omissions as the putative class members. As to the other two classes, Plaintiffs' claims arise from the same municipal policies and practices, and Plaintiffs' claims are based on the same legal theories as those of all putative class members herein.

935.    The cause of Plaintiffs' injuries is the same as the cause of the injuries suffered by all putative class members herein. With regard to the April 6, 2023, class, it is the same acts and omissions.

936.    With regard to the other two classes, Defendants' policies and practices are the cause of injuries to both Plaintiffs and the putative class members.

937.    Maintaining this action as a class action is superior to other available methods because individual damages claims are not likely to be feasible.

938.    Plaintiffs are capable of fairly and adequately protecting the interests of all putative class members herein because Plaintiffs do not have any antagonistic interests thereto.

939.    Counsel for Plaintiffs is experienced in civil rights litigation, prisoners' rights litigation, complex litigation, and class actions.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983 Fourteenth and Eighth Amendments**
***Against all Individual Defendants***

940.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

941.    Plaintiffs and the putative classes as pretrial detainees had the Fourteenth Amendment right to be free from punishment while in Defendants' custody, care, and control.

942.    Plaintiffs and the putative classes as inmates had the Eighth Amendment right to be free from punishment without due process of law while in Defendants' custody, care, and control.

943.    Plaintiffs and the putative classes, inmates in the care, custody, and control of Defendants, were at all times entitled to a safe living environment, adequate and timely medical treatment, and to be free from unreasonable risks of harm to their future health, and/or injury.

944.    Defendants disregarded known risks to Plaintiffs' and the putative classes' safety.

945.    Defendants denied Plaintiffs and the putative classes medical treatment.

946.    Plaintiffs and the putative classes suffered from sufficiently serious medical need, and Defendants disregarded a known risk.

947.    As a result of the denial of medal treatment, Plaintiffs and the putative classes were forced to suffer prolonged, worsening, and more significant health conditions.

948.    Defendants, knowing that Plaintiffs' and the putative classes' constitutional rights were violated by their colleagues and subordinates, failed to intervene prior to or during such violations of Plaintiffs and the putative classes' rights.

949.    Defendants acts constituted a cruel and unusual punishment that served no legitimate penological purpose and caused Plaintiffs' and the putative classes substantial harm, injury, and put Plaintiff in significant danger including risk of death.

950.    Defendants were deliberately indifferent to Plaintiffs' and the putative classes' safety, welfare, serious risk of harm to their future health, and serious medical needs.

951.    Defendants' deliberate indifference to Plaintiffs and the putative classes' serious medical needs caused Plaintiffs and the members of the putative classes significant pain, injuries, and harm.

952.    Defendants' acts and omissions shock the conscience.

953.    Defendants were deliberately indifferent to the harm they knew or should have known was likely to befall Plaintiffs and the putative classes from their action/inaction.

954.    Defendants acted and/or failed to act maliciously and sadistically and for the purpose of harming Plaintiffs and the putative classes.

955.    Defendants failed to intervene or otherwise protect Plaintiff and the putative classes as they were obligated to do as alleged above.

956.    Defendants' acts and/or omissions served no legitimate government purpose.

957.    Defendants acted willfully, wantonly, and with conscious disregard of the rights of Plaintiffs Plaintiff and the putative classes.

958.    Each individual defendant acted under color of state law and within the scope of their employment with the City and/or HHC and CHS.

959.    Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiffs Plaintiff and the putative classes of their constitutional rights secured by the Eighth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.

960.    As a result of Defendants' acts and omissions, Plaintiffs Plaintiff and the putative classes sustained damages, including, but not limited to, severe physical injuries, psychological injuries, and violations of Plaintiffs Plaintiff and the putative classes' rights privileges and immunities secured by the Constitution and federal law.

961.    Plaintiffs Plaintiff and the putative classes are entitled to punitive damages.

962.    By reason of the foregoing, defendants Plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth and Eighth Amendments to the United States Constitution.

963.    Plaintiffs Plaintiff and the putative classes are entitled to compensatory damages, punitive damages, attorneys' fees and costs, injunctive relief, and other relief.

**SECOND CAUSE OF ACTION**
**Municipal Liability pursuant to 42 U.S.C. § 1983**
*Against the City, Maginley-Liddie, Brereton, Lemon, Miller*
*HHC, Katz, Wei, Yang, Subedi, Arias, Castellanos and Rosner*

964.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

965.    The aforesaid violations of Plaintiffs and the putative classes' rights are not an isolated incident.

966.    Defendants were aware from judicial decisions and orders, lawsuits, notices of claims, official reports, investigations, consent orders, complaints that many agents, servants, employees, and contractors of DOC and HHC were insufficiently trained, and such improper training has often resulted in a deprivation of civil rights.

967.    Despite such notice, the City, HHC, and the individually named final policy makers have failed to take corrective action. This failure caused the Defendants to violate the rights and to injure the Plaintiffs and the putative class.

968.    At all times, Defendants the City, HHC, and the individually named final policy makers by their agents, servants and/or employees, carelessly, and recklessly trained individuals for their employment.

969.    At all times, Defendants the City, HHC, and the individually named final policy makers caused, permitted, and/or allowed the individual employees, agents, and contractors to act in an illegal, unprofessional, and/or deliberate manner in carrying out their official duties and/or responsibilities.

970.    At all times, Defendant the City, HHC, and the individually named final policy makers, by their agents, servants and/or employees carelessly, and recklessly retained in its employ, the individual employees or agents, who were clearly unfit for their positions, and acted

in an illegal, unprofessional, and/or deliberate manner in carrying out their official duties and/or responsibilities.

971.     The occurrence(s) and injuries sustained by Plaintiffs and the putative classes, were caused by, and as a result of, the malicious, careless, reckless, and/or intentional conduct of Defendants the City, HHC, and the individually named final policy makers.

972.     Plaintiffs and the putative classes as pretrial detainees had the Fourteenth Amendment right to be free from punishment while in Defendant's custody, care, and control.

973.     Plaintiffs and the putative classes, as inmates in the care, custody, and control of Defendants, were at all times entitled to a safe living environment, adequate and timely medical treatment, and to be free unreasonable risks to future health, and/or injury.

974.     Defendants City, HHC, and the individually named final policy makers knew or should have known that their policies, procedures, and/or practices and customs as outlined would fail to provide a safe living environment, adequate and timely medical treatment, and to be free unreasonable risks to future health, and/or injury.

975.     Defendants City, HHC, and the individually named final policy makers knew or should have known failure train its staff and to enact appropriate policies led to the violation of Plaintiffs and the putative classes' rights under the Eighth and Fourteenth Amendments.

976.     Defendants City, HHC, and the individually named final policy makers violated the law and Constitutional rights when by their policies, procedures, practices, and customs failed to implement fire prevention and safety measures, fire and emergency planning, and evacuation protocols.

977.    Defendants City, HHC, and the individually named final policy makers violated the law and Constitutional rights when by their policies, procedures, practices, and customs denied Plaintiffs and the putative classes medical and mental healthcare.

978.    Defendants City, HHC, and the individually named final policy makers were deliberately indifferent to Plaintiffs and the putative classes' right to safe and habitable living conditions and their serious medical needs.

979.    Defendants City, HHC, and the individually named final policy makers failed to train their employees, agents, servants, and contractors regarding their duties to prevent and put out fires, protect and evacuate inmates from smoke and fire, to provide medical care to those who have been exposed to smoke and fire.

980.    Defendants City, HHC, and the individually named final policy makers knew to a moral certainty that their failures to enact appropriate policies and procedures, and to properly train, supervise, and discipline employees regarding same would lead to serious physical and mental harm to Plaintiffs and the putative classes, and/or those in the same positions as Plaintiffs and the putative classes.

981.    Defendants' conduct was intentional, willful, and performed in disregard of the rights, privileges, and immunities under New York State law and Federal Law of the Plaintiffs and the putative classes.

982.    As a direct and proximate result of the unlawful conduct, Plaintiffs and the putative classes have sustained damages.

983.    Plaintiffs further seek punitive damages, costs, and attorneys' fees against the individually named policy makers.

984.    Defendants City, HHC, and the individually named final policy makers were deliberately indifferent to the harm they knew or should have known was likely to befall Plaintiffs and the putative classes from their action/inaction.

985.    Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiffs and the putative classes of their constitutional rights secured by 42 U.S.C. § 1983 and the, Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

986.    Defendants' deliberate indifference to Plaintiffs and the putative classes' serious medical and safety needs caused Plaintiffs significant pain, injuries, and harm.

987.    By reason of the foregoing, Defendants deprived Plaintiffs and the putative classes of the rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourth, Fourteenth and Eighth Amendments to the United States Constitution.

988.    As a direct and proximate result of the acts detailed above, Plaintiffs and the putative classes are entitled to damages.

## THIRD CAUSE OF ACTION
### Conspiracy pursuant to 42 U.S.C. §§ 1983 and 1985(3)
#### *Against all Defendants*

989.    Plaintiffs repeat and reallege all the foregoing paragraphs as if the same were fully set forth at length herein.

990.    The City and individual Defendants who are or were state actors, entered into an agreement with private entities HHC Katz, Wei, Yang, Subedi, Arias, Castellanos, Rosner, PAGNY, Chew, Becker, Urgicare, Flores and Wachtel.

991.    This agreement, express or tacit, was to act in concert to inflict unconstitutional injury, and to deprive Plaintiffs and the putative classes the equal protection of the laws, or the equal privileges and immunities under the laws.

992.    The aims of this conspiracy was to deprive Plaintiffs and the putative classes of their rights under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, to wit, denying Plaintiffs and the putative classes medical care, by providing the least amount of care to Plaintiffs and the putative classes, to avoid taking Plaintiffs and the putative classes for treatment to hospitals particularly those owned and operated by HHC, in an effort to conceal he full risks to the health and safety of Plaintiffs and the putative classes created by the unconstitutional conditions of confinement perpetrated by Defendants.

993.    In furtherance of the conspiracy, Defendants did in fact deny Plaintiffs and the putative classes medical care required by due process and remained deliberately indifferent to the needs to formulate policies, practices, procedures, and protocols to respond to inmates who are suffering from mental health crises and who may resort to setting fires within the jail or other maladaptive behavior endemic to Defendants' system.

994.    In furtherance of the conspiracy, Defendants did in fact deny Plaintiffs and the putative classes medical care required by due process and remained deliberately indifferent to the needs to formulate policies, practices, procedures, and protocols to treat Plaintiffs and the putative classes for exposure to smoke and fire in Defendant City's jails.

995.    In furtherance of the conspiracy, Defendants agreed to allow the creation of false and inaccurate medical records, to maintain an electronic medical record (EMR) system that was outdated, defective, lacked tracking and alert capabilities, lacked the ability to transfer patient data to hospitals, and failed to ensure that HHC, PAGNY and Urgicare providers to follow predefined medical protocols based on inputs about the patient's condition.

996.    Plaintiffs and the putative classes were injured by these acts and omissions.

997.     As a direct and proximate result of Defendants' conspiracy, Plaintiffs and the putative classes were denied medical care, made to suffer prolonged or worsening medical conditions, which in turn caused them fear, anxiety, and other mental and emotional harms.

998.     As a direct and proximate result of Defendants' conspiracy, Plaintiffs and the putative classes have suffered and will continue to suffer, severe emotional distress and mental anguish, physical injuries, economic loss, and other damages.

999.     As a result of Defendants conspiracy, Plaintiffs and the putative classes are entitled to compensatory damages, punitive damages, attorneys' fees and costs, injunctive relief, and other relief.

**FOURTH CAUSE OF ACTION**
**Negligence**
***Against All Defendants***

1000.   Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

1001.   Defendants City, HHC, PAGNY, Urgicare, and their employees owed a duty of care to Plaintiffs and the putative classes as a pretrial detainee, an inmate in their custody, and/or patient.

1002.   Defendants owed a duty of care to Plaintiffs and the putative classes to prevent the conduct alleged, because under the same or similar circumstances, a reasonable, prudent and careful person should have anticipated that injury to Plaintiffs, the putative classes or to those in a like situation would probably result from the foregoing conduct.

1003.   Defendants owed a duty of care to Plaintiff and the putative classes to prevent the conduct alleged, because under the same or similar circumstances, a reasonable, prudent and

careful person should have anticipated that injury to Plaintiffs or to those in a like situation would probably result from the foregoing conduct.

1004. Defendants breached their duty to Plaintiffs and the putative classes.

1005. Plaintiffs also allege *per se* negligence based on the Defendants' violation of the New York State Correction Law, local law, and Humane Alternatives to Long-Term (HALT) Solitary Confinement Act.

1006. Defendants' persistent mistreatment of those in its custody, including by segregating them into 23-hour a day or more lockdown, refusing to provide competent and regular medical and mental healthcare, failing to discipline or supervise staff who are abusive and dismissive of serious medical and conditional concerns, failure to appropriately staff housing units and video review units, and longstanding failure to address grievances and other inmate concerns, have caused those with mental illnesses to resort to setting fires in their cells to compel Defendants to carry out their statutory and Constitutionally mandated duties.

1007. While these behaviors are maladaptive, they are direct and predictable responses to the systemic chaos, disorder, despair, and manifest unfairness that Defendants have created and maintained in their jails.

1008. These failures constituted a breach of the Defendants' non-delegable duties to Plaintiffs and the putative classes.

1009. As a direct and proximate result of Defendants' negligent, careless, reckless, intentional, unlawful, unconstitutional, and/or deliberately indifferent conduct, Plaintiffs and the putative classes have suffered and will continue to suffer, severe emotional distress and mental anguish, physical injuries, economic loss, and other damages.

1010. Plaintiffs and the putative classes are entitled to compensatory damages, punitive damages, attorneys' fees and costs, injunctive relief, and other relief.

**FIFTH CAUSE OF ACTION**
**Negligent Hiring, Training, Supervision,**
**and Retention of Employees and Contractors**
*Against Defendants City, HHC, PAGNY, and Urgicare*

1011.   Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

1012.   Defendants City, HHC, PAGNY, and Urgicare employed the individual Defendants named herein.

1013.   Defendants City employed corrections personnel at Rikers Island.

1014.   Defendants City, HHC, PAGNY, and Urgicare employed the medical staff and contractors at Rikers Island.

1015.   Defendant City knew or should have known that HHC and its subcontractors were unfit to operate CHS.

1016.   Defendants City and HHC knew or should have known that PAGNY and its subcontractors were unfit to provide the workforce for CHS.

1017.   Defendants City and HHC knew or should have known that Urgicare and its subcontractors were unfit to operate Urgicare within CHS.

1018.   Defendants knew or should have known that their agents, servants, employees, officers, and contractors were unfit for their positions.

1019.   Defendants failed to make reasonable hiring inquiries and/or conduct reasonable and prompt investigations into their agents, servants, employees, officers, and contractors.

1020.   Defendants hired and retained their agents, servants, employees, officers, and contractor despite their propensities to commit the tortious acts.

1021.   Defendants failed to adequately train their agents, servants, employees, officers, and contractors.

1022.   Defendants failed to adequately supervise and monitor their agents, servants, employees, officers, and contractors.

1023.   As a direct and proximate result of Defendants' negligent, careless, reckless, intentional, unlawful, unconstitutional, and/or deliberately indifferent conduct, Plaintiffs and the putative classes have suffered and will continue to suffer, severe emotional distress and mental anguish, physical injuries, economic loss, and other damages.

1024.   Plaintiffs and the putative classes are entitled to compensatory damages, punitive damages, attorneys' fees and costs, injunctive relief, and other relief.

### SIXTH CAUSE OF ACTION
**Intentional and Negligent Infliction of Emotional Distress**
***Against All Defendants***

1025.   Plaintiffs repeat and re-allege each and every allegation in paragraphs as if set forth fully herein.

1026.   By the actions and omissions described above, amongst others, Defendants have engaged in extreme and outrageous conduct, with the intent to cause, or a disregard for the substantial probability of causing, severe emotional distress.

1027.   Defendants' breach of their duties of care owed to Plaintiffs and the putative classes directly resulted in physical, mental, and emotional harm.

1028.   Defendants breached a duty owed to Plaintiffs and the putative classes to protect their safety, health and well-being while under Defendants' care, custody, supervision, and treatment.

1029.   Defendants breached the duty owed to Plaintiff and the putative classes to protect their bodily integrity while in their care, custody, supervision, and treatment.

1030.   As a direct and proximate result of Defendants' unlawful conduct Plaintiffs and the putative classes have suffered, and continues to suffer, severe emotional distress and mental anguish for which she is entitled to an award of damages.

1031.   As a direct and proximate result of Defendants' negligent, careless, reckless, intentional, unlawful, unconstitutional, and/or deliberately indifferent conduct, Plaintiffs and the putative classes have suffered and will continue to suffer, severe emotional distress and mental anguish, physical injuries, economic loss, and other damages.

1032.   Defendants' intentional, reckless, malicious, willful and wanton conduct entitles Plaintiffs and the putative classes to an award of punitive damages to the greatest extent permitted by law.

**SEVENTH CAUSE OF ACTION**
**Violation of the New York City Human Rights Law (NYCHRL)**
***Against All Defendants***

1033.   Plaintiffs repeat and reallege all the foregoing paragraphs as if the same were fully set forth at length herein.

1034.   Plaintiffs and the putative classes are aggrieved persons as defined by the NYCHRL.

1035.   The NYCHRL prohibits discrimination based on a person's actual or perceived disability.

1036.   Defendant HHC is a provider of public accommodation as defined in the NYCHRL as it operates NYC area hospitals and medical centers where the public can access health and mental health care.

1037.   Defendant HHC's area hospitals, including Bellevue and Elmhurst, are providers of public accommodation as defined in the NYCHRL.

1038.   The NYCHRL prohibits providers of public accommodation from the following on the basis of the actual or perceived disabilities suffered by Plaintiffs and the putative classes.: (a) Refusing, withholding from, or denying the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation and (b) Representing that any accommodation, advantage, facility or privilege of any such place or provider of public accommodation is not available when in fact it is available.

1039.   The NYCHRL § 8-107(6) states that aiding, abetting, incident, compelling, and/or coercing, any discriminatory practices forbidden by the NYCHRL or attempting to do so is also an unlawful discriminatory practice.

1040.   CITY has a non-delegable duty to provide medical and mental health treatment to inmates in its custody.

1041.   HHC has a non-delegable duty to provide medical and mental health treatment to inmates in the custody of the CITY including through Correctional Health Services (CHS) including removal to area hospitals and mental facilities for diagnosis, treatment, and advanced care.

1042.   HHC provides medical and mental health treatment to inmates in the custody of the CITY including at its area hospitals, including, but not limited to Elmhurst Hospital and Bellevue Hospital.

1043.   Defendants CITY and HHC jointly operate medical and mental health facilities on Rikers Island, Bellevue and Elmhurst.

1044.   The Constitution and State and local law require Defendants to ensure that those in custody are given the same medical and mental healthcare as they would receive in the community.

1045.   Defendants separately or acting in furtherance of a common scheme or conspiracy, denied Plaintiffs and the putative classes access to the same medical and mental health treatment and testing that Plaintiff would have received at an area hospital after exposure to smoke in an active fire.

1046.   Defendants falsified medical, mental health, and DOC records in an effort cover up their departures and to ensure that Plaintiffs and the putative classes cannot prove their exposure to specific toxins and dangerous particulate matter following structural fires.

1047.   As a direct and proximate result of Defendants' negligent, careless, reckless, intentional, unlawful, unconstitutional, and/or deliberately indifferent conduct, Plaintiffs and the putative classes have suffered and will continue to suffer, severe emotional distress and mental anguish, physical injuries, economic loss, and other damages.

1048.   Plaintiffs and the putative classes are entitled to compensatory damages, punitive damages, attorneys' fees and costs, injunctive relief, and other relief.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff. respectfully requests that the Court enter judgment in his favor, and against Defendants,

as follows:

      a.  Declare that the suit is maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3);

      b.  Award compensatory damages in an amount to be determined for all physical, psychological, mental, and emotional injuries, sustained by Plaintiffs and the classes as a result of Defendants' conduct as alleged herein;

c.  That the Court award punitive or exemplary damages in an amount to be determined at trial;

d.  That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

e.  That the Court award pre- and post-judgment interest at the maximum legal rate;

f.  Declare that Defendants' policies, procedures, practices, and customs, as well as Defendants' failure to train, supervise, and discipline, violate the rights of Plaintiffs and the classes, enjoin Defendants from continuing such violations, and decree such prospective relief as the Court deems appropriate to remedy said violations; and

g.  That the Court grant all such other relief as it deems just and proper.


DATED: New York, New York
        July 5, 2024

                              Respectfully,

                              LIAKAS LAW, P.C.
                              *Attorneys for Plaintiffs*
                              40 Wall Street, 50th Floor
                              New York, New York 10005
                              Tel: (212) 937-7765

                              /s/
                              _____
                              JOSHUA J. LAX, ESQ.

                              /s/
                              _____
                              CASSANDRA ROHME, ESQ.